[No. 13829-8-II.   Division Two.   December 23, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. DENNIS POTTER, *Appellant*.

*Jeffrey B. Ranes,* for appellant (appointed counsel for appeal).

*H. Steward Menefee, Prosecuting Attorney,* and *Gerald R. Fuller, Deputy,* for respondent.

SEINFELD, J. — In 1989 Dennis Potter confessed to the 1976 strangulation murder of his wife, Norma. In 1990 Potter was convicted of murder in the second degree. Prior to his 1989 confession, law enforcement authorities had attributed Norma's death to injuries sustained in a 1-car accident. Potter now contends the trial court should have granted his motion to dismiss based on precharging delay. In the alternative, he seeks reversal of his conviction, arguing that the trial court's failure to give his "deific command" jury instruction on insanity denied him a fair trial. We affirm.

136

On November 28, 1976, sheriff's deputies and Washington State Patrol troopers responded to an automobile accident in rural Grays Harbor County. They discovered the body of Norma Potter lying near the family car. It appeared to the investigating officers that Dennis Potter, the driver of the car, had lost control of his vehicle rounding an icy curve, and had crashed into an embankment. Trooper Burns of the State Patrol determined that Norma's husband, Dennis Potter, had been driving the car at the time of the "accident". Trooper Burns found no indication that Norma's death was caused by anything other than the trauma she sustained in the car collision. He later filed a report to this effect. The coroner did not perform an autopsy, apparently relying upon the accident report in describing "massive skull fractures and chest injuries" as the cause of Norma's death.

Within the next few weeks, the sheriff's office received information that Potter "had been having some mental problems and was depressed" and that Norma had indicated Potter had put her in fear for her life. When deputy sheriffs visited Potter at his home on December 8, 1976, to question him further, Potter appeared "extremely distraught" and "nervous". He was talking about "hearing voices" and told the deputies, "I can't change anything . . . I tried to commit suicide with the car the other night but it didn't happen. It killed my wife and all I got was a cut on my head." Later that day, Potter's friends took him to Western State Hospital (WSH) where he voluntarily admitted himself in order to obtain psychological help.[1] He remained there for about 6 weeks.

The deputies informed Trooper Burns of Potter's comments. Burns prepared a supplemental accident report in which he stated "[t]hat the accident was in fact an intentional accident, not a traffic accident."

---

[1] This was not Potter's first visit to WSH. Potter had voluntarily admitted himself into WSH in May of 1976 for an evaluation period during which he was prescribed antidepressants. On this occasion, Potter stayed at WSH from December 8, 1976, to January 31, 1977.

In April 1977, Connie Judd, Potter's daughter, gave a statement to sheriff's deputies that her father had called her on a number of occasions after the crash and after his release from WSH and told her that "it wasn't an accident, that he had murdered her." Connie assumed Potter meant he had killed Norma in the car collision. She did not tell the deputies about other disclosures Norma had made to her regarding threatening statements made by Potter. For example, not until trial did Connie relate Potter's statements to Norma that "they both had to die."

Potter also talked to a family friend, Sue Hayes, after his release from WSH in early 1977. He told Hayes that he had killed Norma by strangling her and that the "accident" was actually an attempt to kill himself. Hayes allegedly reported this to the investigating deputy sheriff but there is no evidence that the deputy prepared a written statement to that effect. Hayes testified that the deputy advised her that a written report was unnecessary because the authorities had completed their investigation of the Potter case.

After receiving the additional information regarding Potter's "mental problems" and his various statements concerning the "accident", the sheriff's office prepared a "prospective summary" of its investigation. The "summary" indicated that the "accident" was actually a deliberate act. The sheriff's office allegedly forwarded the summary, along with the statements and reports that it had collected, to the prosecutor for his review.

The chief criminal deputy prosecutor declined to prosecute, and sent the sheriff's office a declination letter on June 8, 1977. The prosecutor later testified that when he made the decision to decline prosecution, he relied solely on the coroner's report and on the original report from Trooper Burns that indicated an accidental cause of death. In his testimony, the prosecutor stated that had he been in possession of any contrary information, he would "have conferred with the investigating officers and discussed additional investigation." Absent contrary information, the prosecutor's

office did not pursue the matter further. Instead, it closed its case file on the death of Norma Potter.

On March 14, 1989, Potter walked into the Hoquiam Police Department and confessed that he had killed Norma by strangulation. He explained that he first broke her jaw and then strangled her to death. He next placed her body in the car, and drove the car off the road in a claimed suicide attempt.

The sheriff arranged for the performance of an autopsy. The medical examiner determined that there were no head or chest injuries and concluded that strangulation was the actual cause of death.

On April 3, 1989, the prosecutor filed an information charging Potter with murder in the second degree. The trial court denied Potter's motion to dismiss for prosecutorial delay. The defense then filed a notice of intent to rely upon insanity defense.

At trial, the defense offered the following jury instruction, which counsel described as the "Deific Command" instruction:

> In addition to the plea of not guilty, the defendant has entered a plea of insanity existing at the time of the act charged.
>
> Insanity existing at the time of the commission of the act charged is a defense.
>
> For a defendant to be found not guilty by reason of insanity, you must find, that as a result of mental disease or defect, the defendant believed he was acting under the direct command of God, and the defendant's free will was totally subsumed by the deific command.
>
> If you find that the defendant did suffer from a mental disease or defect, and that the defendant believed that he was acting under the direct command of God, and that the defendant's free will was totally subsumed by the deific command, you need not address whether the defendant understood the nature and quality of his act, or whether or not the defendant knew what he was doing was right or wrong.

The trial court rejected that instruction and gave the following:

> If you find that the defendant believed, because of mental disease or defect, that he was acting under the direct command

of God he may be found not guilty by the reason of insanity only if you find, by a preponderance of the evidence, that this belief prevented the defendant from comprehending the act with which he is charged was morally wrong or prevented the defendant from perceiving the nature and quality of the act with which he is charged.

The trial court also gave the WPIC 20.01 instruction on insanity and an instruction advising the jury that a person acting in response to an "irresistible impulse" is not legally insane. The jury rejected Potter's insanity defense and found him guilty of second degree murder.

## PRECHARGING DELAY

There is no statute of limitations for murder. *See* RCW 9A.04.080(1)(a)(i). Nevertheless, Potter contends that his due process rights were violated by the 12½-year delay between the occurrence of the crime and the filing of the charge. He asserts that the information the State relied upon in 1989 in filing its murder charge was available in 1977, and that the State's negligent investigation led to the long precharging delay. Potter claims that he was prejudiced by the delay as follows:

1. He was unable to obtain a psychiatric evaluation close in time to the crime;

2. Witnesses potentially helpful to the defense had died or disappeared;

3. Memories had faded; and

4. He was unable to have Norma's body examined to determine all possible causes of death.

Delay between an alleged criminal occurrence and the filing of charges does not violate a defendant's right to a speedy trial. *United States v. Loud Hawk*, 474 U.S. 302, 312, 88 L. Ed. 2d 640, 106 S. Ct. 648 (1986); *United States v. Marion*, 404 U.S. 307, 320, 30 L. Ed. 2d 468, 92 S. Ct. 455 (1971); *State v. Gee*, 52 Wn. App. 357, 366, 760 P.2d 361 (1988), *review denied*, 111 Wn.2d 1031 (1989). Rather, precharging delay is tested under the due process clause. *United States v. Lovasco*, 431 U.S. 783, 52 L. Ed. 2d 752, 97 S. Ct. 2044 (1977); *State v. Chavez*, 111 Wn.2d 548, 558, 761

P.2d 607 (1988); *State v. Calderon*, 102 Wn.2d 348, 353, 684 P.2d 1293 (1984); *State v. Bernson*, 40 Wn. App. 729, 733, 700 P.2d 758 (citing numerous cases), *review denied*, 104 Wn.2d 1016 (1985).

In *Chavez*, the Washington Supreme Court provided a test for evaluating precharging delay claims:

> While statutes of limitations are the " 'primary guarantee against bringing overly stale criminal charges' ", such statutes do not fully define a defendant's rights with respect to events occurring prior to charging. Instead, due process requires dismissal of a charge if it is shown at trial that precharging delay caused substantial prejudice to a defendant's rights to a fair trial. We have framed a 3-prong test for determining when preaccusatorial delay violates due process. Under that test, "(1) The defendant must show he was prejudiced by the delay; (2) the court must consider the reasons for the delay; and (3) if the State is able to justify the delay, the court must undertake a further balancing of the State's interest and the prejudice to the accused."

(Footnotes omitted.) *Chavez*, 111 Wn.2d at 558 (quoting *State v. Haga*, 8 Wn. App. 481, 483, 507 P.2d 159, *review denied*, 82 Wn.2d 1006 (1973); *State v. Alvin*, 109 Wn.2d 602, 604, 746 P.2d 807 (1987)); *see also State v. Dixon*, 114 Wn.2d 857, 860, 792 P.2d 137 (1990); *State v. Lidge*, 111 Wn.2d 845, 848, 765 P.2d 1292 (1989).

The defense must demonstrate "sufficient [prejudice] to overcome the legislative intent to prosecute the crime as evidenced by the absence of a statute of limitation." *State v. Newcomer*, 48 Wn. App. 83, 92, 737 P.2d 1285, *review denied*, 109 Wn.2d 1014 (1987); *State v. Bernson*, 40 Wn. App. 729, 734, 700 P.2d 758, *review denied*, 104 Wn.2d 1016 (1985); *State v. Ansell*, 36 Wn. App. 492, 497, 675 P.2d 614 (citing *State v. Haga*, 8 Wn. App. 481, 507 P.2d 159 (*Haga* I), *review denied*, 82 Wn.2d 1006 (1973)), *review denied*, 101 Wn.2d 1006 (1984). This prejudice must be actual, not speculative.[2]

---

[2]*See United States v. Lovasco*, 431 U.S. at 789 ("proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatic[]"); *United States v. Wallace*, 848 F.2d 1464, 1469-70 (9th Cir. 1988) ("defendant must show actual, non-speculative prejudice as a result of the delay"); *United States v. Moran*, 759 F.2d 777, 780 (9th Cir. 1985) ("The

The trial court is in the best position to determine whether the defendant will suffer "actual prejudice" from the delay. *State v. Haga*, 13 Wn. App. 630, 634, 536 P.2d 648 (1975) (*Haga II*), *cert. denied*, 425 U.S. 959, 48 L. Ed. 2d 204, 96 S. Ct. 1740 (1976); *see also State v. Ansell, supra*; *State v. Bernson, supra*.

As the following review of each of Potter's claims of prejudice shows, Potter has failed to satisfy the first prong of the due process analysis: a demonstration of actual prejudice. We conclude that the prejudice Potter alleges is speculative at best.

### 1. Psychiatric Evaluation

Potter claims that he was prejudiced by his inability to obtain a psychiatric evaluation close in time to the crime. However, the record shows that he entered a psychiatric hospital 10 days after the "accident" and remained there for approximately 1½ months. He was also in the same hospital earlier the same year. Thus, when doctors prepared psychiatric evaluations in anticipation of the 1990 trial, there was considerable information available about Potter's mental state in 1976, close to the time of the "accident". The trial testimony of those doctors contradicts Potter's claim that the passage of time prejudiced his ability to obtain an adequate psychiatric evaluation. Dr. Morrison of WSH (who determined Potter was sane) testified that he had "adequate data" to make a sanity determination and, if anything, was hindered by having too much information. Although Dr. Morrison conceded that the passage of time made the evaluation more difficult, he concluded that the delay did not "prejudice . . . rendering an opinion."

Dr. Trowbridge (who found Potter was suffering from a "deific command"/paranoid schizophrenia) testified that

---

Supreme Court . . . [has] established a two-prong test for determining if preindictment delay has risen to the level of a denial of due process. The first prong of this test is that the defendant must prove 'actual prejudice' occurred from delay"), *cert. denied*, 474 U.S. 1102, 88 L. Ed. 2d 920, 106 S. Ct. 885 (1986); *Bernson*, 40 Wn. App. at 734 ("the accused must specifically demonstrate the delay caused actual prejudice to his defense").

there was nothing inherently prejudicial in the delay. He noted that there was a large amount of information about Potter's mental status around the time of the accident. Dr. Trowbridge testified that this large amount of information, more information than is usually available in such a case, allowed him to render his opinion. Though Dr. Trowbridge testified it would have been "helpful" to have interviewed Potter in 1977, he noted it was "speculative" whether the uncooperative Potter would have provided any additional useful information.

The trial court noted:

> It seems to me that there's a lot more information about Mr. Potter's mental state around the time of the incident than there is in many cases because he, in fact, was observed by professionals both before and immediately after, shortly after, this incident.

The trial court's observation was correct. Potter was not prejudiced in this respect.

### 2., 3. Disappearing Witnesses/Dimmed Memories

■ Potter further contends the delay resulted in the "death or disappearance of several witnesses who *may* have been helpful to the defense." (Italics ours.) Potter also claims the delay caused some of the witnesses' memories to fade. Potter does not detail who these witnesses are or what they might have said, nor does he point to any specific testimony that demonstrated prejudicial "dimmed memories". Simply alleging "that witnesses are unavailable or the memories have dimmed is insufficient." *State v. Gee*, 52 Wn. App. 357, 367, 760 P.2d 361 (1988), *review denied*, 111 Wn.2d 1031 (1989); *Bernson*, 40 Wn. App. at 733.

Defendants have presented and courts have rejected similar speculative claims of prejudice in a number of cases. For example, in *State v. Ansell*, *supra*, the court rejected the defendant's claim, noting that he failed to specify which witnesses were unavailable to testify and that delay and "dimmed memories" "could weaken the State's case as well." 36 Wn. App. at 498. *See also United States v. Wallace*, 848 F.2d 1464, 1469-70 (9th Cir. 1988); *United States v. Saun-*

*ders*, 641 F.2d 659 (9th Cir. 1980), *cert. denied*, 452 U.S. 918, 69 L. Ed. 2d 422, 101 S. Ct. 3055 (1981); *State v. Gee, supra*.

In denying the motion to dismiss in this case, the trial court explained that "[t]here's nothing before the Court indicating the essential witnesses have died or could not be located and their testimony is not available from other sources." This statement is fully supported by the record and was an appropriate reason for denying the motion. The defense's speculative contentions, and failure to point to particular instances of prejudicially dimmed memories, do not give rise to actual prejudice.

### 4. Forensic Evaluation

■ Finally, the defense contends that the delay prevented it from having Norma Potter's body examined by a forensic pathologist (presumably close in time to the accident). However, Potter does not tell us what information he would have obtained from such an examination or, conversely, the nature of the prejudice caused by the lack of a timely pathologist's examination. The State points out the defense did not even seek to undertake such an evaluation after Norma's body was exhumed. Furthermore, the defense did not deny that Potter had killed Norma. Rather, its theory was that he had done so while operating under a deific decree. Again, the defense fails to demonstrate "actual prejudice" from the mere passage of time.

At best, the defense has shown potential prejudice occasioned by the 12½-year delay. However, it must show "actual prejudice" to justify reversal for a violation of due process rights. *Lovasco*. Potter has failed to satisfy the first prong of the due process analysis. *See Wallace*, 848 F.2d at 1470 ("[b]ecause we conclude that [defendant] failed to establish actual prejudice, we do not consider the reasons for and length of the delay").

### INSANITY INSTRUCTIONS: DEIFIC COMMAND EXCEPTION

At trial, the defense relied upon the insanity defense. This required Potter to show that:

(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
(a) He was unable to perceive the nature and quality of the act with which he is charged; or
(b) He was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010. The trial court instructed the jury in accordance with the statute. The court also instructed the jury that it could find Potter not guilty by reason of insanity if it found that Potter believed he was acting under a direct command of God and that belief prevented him "from comprehending the act with which he is charged was morally wrong or prevented the defendant from perceiving the nature and quality of his act."

Potter does not contend that the court's instruction was inaccurate. Rather, he argues that the trial court should have given his proposed instruction which sets forth a variation to the general rule. Potter's proposed instruction would establish a special rule for persons who possess the cognitive ability to know the nature and quality of their acts and can tell the difference from right and wrong, but nonetheless lack volitional control of their behavior because they are unable to overcome a "deific command".

Potter contends that there is support for an exception to the traditional 2-pronged test for insanity in several Washington Supreme Court cases. A cursory look at the language used by the Supreme Court in the cases cited by Potter might suggest that Potter's position has merit. However, following a closer analysis we are satisfied that these cases are simply case specific reformulations of the traditional insanity test.[3]

---

[3] At the outset we note that the defendant's proffered jury instruction on the "deific decree exception" was not included in the record on appeal. "The clerk's papers shall include, at a minimum . . . any jury instruction given or refused which presents an issue on appeal." RAP 9.6(b)(1)(F). "Matters referred to in the brief but not included in the record cannot be considered on appeal." *State v. Stockton*, 97 Wn.2d 528, 530, 647 P.2d 21 (1982); *State v. Bradfield*, 29 Wn. App. 679, 630 P.2d 494 (appellate court refused to consider prejudicial statement in opening statement when the opening statement was not in the record), *review denied*, 96 Wn.2d 1018 (1981). Counsel at oral argument contended that the jury

■ In *State v. Crenshaw*, 98 Wn.2d 789, 659 P.2d 488 (1983), the court was called upon to interpret the meaning of "wrong" in the *M'Naghten* rule. Did it refer to a "moral" wrong, a "legal" wrong, or both? In passing, the court remarked:

> A narrow exception to the societal standard of moral wrong has been drawn for instances wherein a party performs a criminal act, knowing it is morally and legally wrong, but believing, because of a mental defect, that the act is ordained by God: such would be the situation with a mother who kills her infant child to whom she is devotedly attached, believing that God has spoken to her and decreed the act. *See People v. Schmidt*, [216 N.Y. 324, 339, 110 N.E. 945 (1915)]. Although the woman knows that the law and society condemn the act, it would be unrealistic to hold her responsible for the crime, since her free will has been subsumed by her belief in the deific decree. *People v. Schmidt, supra.*

*Crenshaw*, 98 Wn.2d at 798. This ambiguous statement of the law can be read to support the defense position — that one can be adjudged insane who has *cognitive ability* (the ability to know an act is wrong, legally and morally), but lacks *volitional control* (the ability to control one's behavior despite cognitive ability). However, for the reasons discussed below, we conclude that this is not the correct interpretation.

Two later Washington Supreme Court cases discuss the "free will" language in *Crenshaw*, and seem to offer conflicting interpretations of the term. In *State v. Cameron*, 100 Wn.2d 520, 674 P.2d 650 (1983), the court appeared to accept the *Crenshaw* "deific decree exception" but held, in that case, "that because of the mental disease it was impossible for [defendant] *to understand that what he was doing was wrong*; . . . that his free will had 'been subsumed by [his] belief in the deific decree.' " (Italics ours.) 100 Wn.2d at 527. The court in *Cameron* looked to *Crenshaw*'s "free will" test, but still focused on the defendant's cognitive ability to tell right from wrong. Therefore, it appears that the *Cameron* court's formu-

instruction was properly proffered and cannot explain its absence from the record. The procedure that should have been followed is clear. *See* CrR 6.15. All counsel should take care to ensure procedural rules are followed to assure their claims will be considered on the merits. This court has determined we have sufficient evidence in the record to address the issue.

lation of the "deific decree exception" is only an alternative expression of the traditional insanity test's inquiry into the actor's ability to tell right from wrong with reference to the particular act charged.

However, *State v. Rice*, 110 Wn.2d 577, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910, 105 L. Ed. 2d 707, 109 S. Ct. 3200 (1989) suggests that a defendant who knows right from wrong, but is unable to control his "urges", could be adjudged insane under the traditional insanity definition. *Rice*, 110 Wn.2d at 604. Rice proposed a "deific decree" instruction that the trial court declined to give.[4] Although the Supreme Court determined that this did not constitute error, it based this conclusion on insufficiency of evidence grounds: the psychiatric testimony did not support Rice's contention that he was unable to control his "urges". The discussion in *Rice* suggests that the defendant's cognitive ability was irrelevant in determining whether the "deific decree" overcame his "free will", and that a jury could find a defendant legally insane who knew right from wrong but was unable to control his urges.

This interpretation of *Rice* is inconsistent with a long line of Washington cases that reject the so-called "irresistible impulse" defense. "Irresistible impulse" is another term used to describe an action taken because of lack of volitional control or ability to control one's impulses.[5] Neither *Crenshaw, Cameron*, nor *Rice* mentions either this term or the cases rejecting the irresistible impulse defense. *See State v. Niblack*, 74 Wn.2d 200, 443 P.2d 809 (1968); *State v. White*, 60 Wn.2d 551, 374 P.2d 942 (1962), *cert. denied*, 375 U.S. 883 (1963).

---

[4]"One who believes that he is acting under the direct command of God is no less insane because he nevertheless knows murder is prohibited by the laws of man." *Rice*, 110 Wn.2d at 604 (quoting *Cameron*, at 526-27).

[5]"An irresistible impulse is one induced by a mental disease affecting the volitive powers so that the person afflicted is unable to resist the impulse to commit the act charged against him. He cannot control his own behavior even though his perceptive powers are unaffected and he understands the nature and consequences of the act charged and perceives that it is wrong." *State v. Edmon*, 28 Wn. App. 98, 105, 621 P.2d 1310, *review denied*, 95 Wn.2d 1019 (1981).

We must assume that this silence in *Crenshaw/Cameron/Rice* regarding the irresistible impulse defense indicates that the Supreme Court did not intend to overrule this long line of case law or create a judicial exception to the insanity statute. If the *Crenshaw/Cameron/Rice* discussions of "free will" are not related to the volitional ability to control behavior, the court must have been referring to the cognitive ability to tell right from wrong. Thus, the formulations of a so-called "deific decree" exception to the traditional insanity definition are actually further elaborations of the second prong of the insanity rule — inability to tell right from wrong with reference to the particular act. In other words, a trial court may use the so-called "deific decree exception" to instruct the jury that a person can be legally insane if that "person's cognitive ability to distinguish right from wrong with respect to the act has been destroyed as a result of a psychotic delusion that God has commanded the act." *People v. Serravo*, 823 P.2d 128, 140 (Colo. 1992).

*People v. Serravo, supra,* is a Colorado Supreme Court case that dealt extensively with the "deific decree" exception. In *Serravo*, the lower court had relied upon *Crenshaw* to hold that a person could be insane when that person "commits a criminal act, knowing it is illegal and morally wrong according to society's standards but, because of a mental defect, believes that God has decreed the act.' " 823 P.2d at 139 (quoting *People v. Serravo*, 797 P.2d 782, 783 (Colo. Ct. App. 1992)). The Supreme Court, sitting en banc, rejected this and determined, after a long discussion of the definition of "wrong" in *M'Naghten* that

> [i]n our view, the "deific decree" delusion is not so much an exception to the right-wrong test measured by the existing societal standards of morality as it is an integral factor in assessing a person's cognitive ability to distinguish right from wrong with respect to the act charged as a crime.

823 P.2d at 139.[6]

---

[6]The *Serravo* court criticized *Crenshaw's* apparent volitional approach to the insanity question, calling it "unnecessarily rigid", and noting that *Crenshaw*:
appears to have judicially embroidered the *Schmidt* opinion, since *Schmidt* contains no reference to the volitional or free will aspect of the insanity

As further support for this interpretation, we note that the *Crenshaw* court relied on Judge Cardozo's opinion in *People v. Schmidt*, 216 N.Y. 324, 339, 110 N.E. 945 (1915). Justice, then Judge, Cardozo expressly rejected the "irresistible impulse" test and, instead, clearly addressed the cognitive ability to tell right from wrong. Justice Cardozo stated "that there are times and circumstances in which the word 'wrong' as used in the statutory test of responsibility ought not to be limited to legal wrong." 216 N.Y. at 339. By defining "wrong" to include more than legal wrong, Justice Cardozo allowed the jury to find a person insane in cases where the persons knew acts were legally wrong, but because of the deific command, did not know the acts were morally wrong. Justice Cardozo determined that a narrow interpretation of the word "wrong" to include only "legal" wrong would "rob the rule of all relation to the mental health and true capacity of the criminal." 216 N.Y. at 339. This is a clear reference to the defendant's cognitive ability, as opposed to volitional control.

After giving the example of the mother who kills her own child knowing the act is against the laws of man, but who was inspired by the command of God, Justice Cardozo noted that the mother could be considered insane because "[i]t seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong. . . . If . . . there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he *knows* the act to be *wrong*." (Italics ours.) 216 N.Y. at 339-40.

Some of the misunderstanding of *Crenshaw* may be due to its discussion of the distinction between "moral" as opposed to "legal" wrong. The *Crenshaw* court decides that the distinction is irrelevant:

---

defense. On the contrary, Judge Cardozo in *Schmidt* specifically states that New York's test of insanity does not contain an irresistible impulse component. 110 N.E. at 949. It thus appears that the *Crenshaw* court added a volitional component to the "deific-decree" exception which is not supported by *Schmidt*.

*Serravo*, 823 P.2d at 139 n.12.

a number of scholars have concluded that, as a practical matter, the way in which a court interprets the word "wrong" will have little effect on the eventual outcome of a case. . . .

Society's morals and legal wrong are interchangeable concepts in the context of this [murder] case. . . . [B]y defining wrong in terms of legal wrong, the trial court did not alter the meaning of the *M'Naghten* test.

98 Wn.2d at 799.

However, in *Schmidt*, Justice Cardozo developed the deific decree exception to ease the harshness of a rigid application of the "legal" versus "moral" wrong distinction. If the distinction between "legal" and "moral" wrong is unimportant, then the phrasing of the insanity definition used in this case appropriately advised the jury of the law. The jury could have found Potter not guilty by reason of insanity even if it concluded that he knew his act was legally wrong if it also was persuaded that Potter believed he was acting in accordance with God's command telling him that his act, at the time and under those particular circumstances, was not morally wrong. In other words, Potter would satisfy the first prong of the insanity defense if his subjective understanding of wrong, legal or moral, became so obscured by the "deific decree" that he could not actually "tell right from wrong with reference to the particular act charged."

In this case, the trial court properly instructed the jury that if the deific decree overcame the defendant's cognitive ability to know that his act was "wrong", the jury could find him not guilty by reason of insanity. The defense instruction, which would have allowed the jury to make this finding on the basis that Potter had cognitive ability but lacked volitional control, was an incorrect statement of the law.[7] The

---

[7]It is also interesting to note that the holding in *Crenshaw* creating the "deific decree" exception is dicta. The "exception" appears in the second of three alternative holdings to the case and is not one of the main holdings. In fact, after stating the "exception", the court held that it was not available in that case. Statements in a case that do not relate to an issue before the court and are unnecessary to decide the case constitute obiter dictum, and need not be followed. *Bellevue v. Acrey*, 103 Wn.2d 203, 207, 691 P.2d 957 (1984); *Concerned Coupeville Citizens v. Coupeville*, 62 Wn. App. 408, 416, 814 P.2d 243, *review denied*, 118 Wn.2d 1004 (1991).

trial court did not err in giving the State's insanity instruction and rejecting the defense alternative.

For the foregoing reasons, the judgment is affirmed.

MORGAN, A.C.J., and ALEXANDER, J., concur.