[No. 49454-6-I. Division One. May 5, 2003.]

THE STATE OF WASHINGTON, *Respondent*, v. BLAINE ALAN
APPLIN, *Appellant*.

*Nancy P. Collins* (of *Washington Appellate Project*), for appellant.

*Janis E. Ellis, Prosecuting Attorney,* and *Seth Aaron Fine* and *Rebecca J. Quirk, Deputies,* for respondent.

ELLINGTON, J. — Blaine Applin killed Dan Jess. He asserted an insanity defense, contending he was acting under a delusional belief that he had received a direct command from God. He challenges the jury instructions, contending the court erred in refusing to define right and wrong. No such definition is generally required, however, and the evidence at trial did not call for a special instruction here. Applin's other claimed errors are either invited or otherwise unreviewable. We therefore affirm.

## FACTS

Blaine Applin was a member of the Gatekeepers, a cult led by Christopher Turgeon. Turgeon was a self-proclaimed prophet who claimed to be in direct communication with God. In 1997, Turgeon learned Child Protective Services was seeking to remove children from some members' homes, so the Gatekeepers moved from Washington to southern California. To finance the move, Turgeon organized various schemes for thefts from local businesses, one of which involved issuing a forged check to Jaime's Transmission in Snohomish. Efforts by Jaime's Transmission to obtain payment eventually led the shop to contact Dan Jess.

Jess had recently left the Gatekeepers. He was upset at being implicated in the scam, and had a combative phone conversation with Turgeon, during which he accused Turgeon of being a false prophet. That evening, Turgeon

called a meeting of the male members of Gatekeepers. He told them he had heard the voice of God, and that God said Dan Jess must be killed.

Believing he was God's "chosen vessel"[1] to kill Jess, Applin volunteered to help, telling Turgeon, "God told me that I must be the one who does it."[2] He and Turgeon drove to Jess's home in Washington. Applin knocked on Jess's door. When Jess answered, Applin shot him numerous times. Turgeon and Applin returned to California and carried out several more robberies. They were eventually arrested and charged with first degree murder.

Applin asserted an insanity defense. The jury convicted him of first degree murder.

## DISCUSSION

■ Washington has adopted the *M'Naghten* test for criminal insanity, which requires that a defendant be unable to tell the difference between right and wrong with reference to the particular act charged.[3] The trial court gave two instructions on the defense in Applin's and Turgeon's trial. The first was the general pattern instruction, which tracked the statutory definition of insanity.[4] The second set forth the so-called "deific decree" defense.

The general insanity instruction read in part:

> For a defendant to be found not guilty by reason of insanity you must find that, as a result of mental disease or defect, the defendant's mind was affected to such an extent that the defendant was unable to perceive the nature and quality of the acts with which the defendant is charged or *was unable to tell*

---

[1] Report of Proceedings (RP) (Sept. 24, 2001) at 1414.

[2] RP (Sept. 19, 2001) at 791.

[3] *M'Naghten's Case*, 10 Clark & Fin. 200, 8 Eng. Rep. 718 (H.L. 1843), *codified at* RCW 9A.12.010; *see also State v. Crenshaw*, 98 Wn.2d 789, 793, 659 P.2d 488 (1983).

[4] *See* 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 20.01 (2d ed. 1994).

*right from wrong* with reference to the particular acts with which the defendant is charged.[5]

The deific decree instruction read:

A defendant is also not guilty by reason of insanity if you find that each of these elements has been proved by a preponderance of the evidence:

1) At the time of the acts charged the defendant had a mental disease or defect; and

2) As a result of that mental disease or defect, the defendant had a delusion that he had received a direct command from God to do the acts; and

3) The defendant did the acts because of that direct command; and

4) *The direct command destroyed the defendant's free will and his ability to distinguish right from wrong.*[6]

■ In Washington the deific decree defense derives from *State v. Crenshaw*,[7] in which the court described the defense as applicable when a defendant "performs a criminal act, knowing it is morally and legally wrong, but believing, because of a mental defect, that the act is ordained by God."[8] Applin contends that instructions on this defense must include a definition stating that wrongfulness refers to *moral*, as well as *legal*, wrong, and that failure to so instruct is reversible error. We turn first to *Crenshaw*.

Crenshaw had killed his wife, and asserted an insanity defense. He challenged the *M'Naghten* instruction given at trial, which stated the insanity test solely in terms of the defendant's ability to understand legal wrong: "What is

---

[5] Clerk's Papers at 40 (emphasis added).

[6] Clerk's Papers at 41 (emphasis added).

[7] 98 Wn.2d 789, 659 P.2d 488 (1983).

[8] *Crenshaw*, 98 Wn.2d at 798. The deific decree insanity defense is traceable to Justice Cardozo's hypothetical in *People v. Schmidt*, 216 N.Y. 324, 339, 110 N.E. 945 (1915): "A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong."

meant by the terms 'right and wrong' refers to knowledge of a person at the time of committing an act that he was acting contrary to the law."[9] Crenshaw contended the instruction should not have defined "right and wrong" solely in the legal, as opposed to the moral, sense. In rejecting Crenshaw's argument, the court observed that "it is society's morals, and not the individual's morals, that are the standard for judging moral wrong under *M'Naghten*."[10] The court observed that "[o]nce moral wrong is equated with society's morals, the next step, equating moral and legal wrong, follows logically. The law is, for the most part, an expression of collective morality."[11] Therefore, because "society's moral judgment is identical with the legal standard," a definition of wrongfulness is unnecessary in most insanity cases involving serious crimes, and an instruction defining wrong only in terms of legal wrong does not misstate the test.[12]

Crenshaw did not claim to have acted under divine command, and the court held he was therefore not entitled to a deific decree defense. In reaching its conclusion, the court discussed the origins and application of the defense, describing it as a "narrow exception to the societal standard of moral wrong."[13] In a case decided soon afterward, the court considered the propriety, in deific decree cases, of the instruction approved in *Crenshaw*.

In *State v. Cameron*, 100 Wn.2d 520, 674 P.2d 650 (1983), the defendant claimed he had killed his stepmother under the psychotic delusion that he had been directed by God to kill Satan's angel. The trial court gave the same instruction given in *Crenshaw*, including the paragraph explaining wrongfulness solely in legal terms. Cameron contended that the term "right and wrong" should have been left

---

[9] *Crenshaw*, 98 Wn.2d at 793.

[10] *Crenshaw*, 98 Wn.2d at 797.

[11] *Crenshaw*, 98 Wn.2d at 799.

[12] *Crenshaw*, 98 Wn.2d at 799.

[13] *Crenshaw*, 98 Wn.2d at 798.

undefined, in accordance with the statutory definition of insanity.[14] The Supreme Court agreed, and held that an instruction like that in *Crenshaw* is error in deific decree cases because it prevents the jury from considering " 'right and wrong' in terms of one's ability to understand the *moral* qualities of the act."[15] The court observed that "one who believes that he is acting under the direct command of God is no less insane because he nevertheless knows murder is prohibited by the laws of man. Indeed, it may actually emphasize his insanity."[16] In such cases, it is error to instruct that only inability to know of legal wrong satisfied the test. The court therefore remanded for a new trial using an instruction without the definition paragraph.[17]

The Supreme Court considered the deific decree defense on one other occasion, in *State v. Rice*.[18] Rice claimed to have "urges" resulting from extraterrestrial communications, some of which involved a battle with Satan or being an emissary of God, but which did not amount to commands ("I could follow [the urges] or not follow them.").[19] The court held Rice did not qualify for a deific decree instruction because there was no evidence Rice's "free will ha[d] been subsumed by his belief in the deific decree."[20]

The only other Washington discussion of the instruction came in Division Two's scholarly opinion in *State v. Potter*.[21] There, the court considered (and upheld) a deific decree instruction stating that the jury could find insanity "if it found that Potter believed he was acting under a direct command of God and that belief prevented him 'from comprehending the act with which he is charged was

[14] *Cameron*, 100 Wn.2d at 526.

[15] *Cameron*, 100 Wn.2d at 526 (emphasis added).

[16] *Cameron*, 100 Wn.2d at 526-27 (citing *Schmidt*, 216 N.Y. 324).

[17] *Cameron*, 100 Wn.2d at 527.

[18] 110 Wn.2d 577, 757 P.2d 889 (1988).

[19] *Rice*, 110 Wn.2d at 595.

[20] *Rice*, 110 Wn.2d at 604-05.

[21] 68 Wn. App. 134, 842 P.2d 481 (1992).

morally wrong or prevented the defendant from perceiving the nature and quality of his act.' "[22] The instruction made no mention of free will, and Potter challenged that omission on appeal.

The *Potter* court examined the opinions in *Crenshaw* and *Rice* in light of the cognitive nature of the *M'Naghten* test, concluded that the Supreme Court did not intend to create an exception to the cognitive test for deific command cases, and held that reference to free will was not required.[23]

Applin relies heavily upon the fact that the instruction affirmed in *Potter* defined wrongfulness solely in moral terms. But because that aspect of the instruction was not an issue, the opinion in *Potter* contains no discussion of the definition of wrongfulness. *Potter* is thus of no help to Applin here.

■ Although *Crenshaw* suggests that no definition is usually required, the court discussed deific decree defenses as an exception from the norm. This discussion is heavily relied upon by Applin for the proposition that in such cases, a definition should be given. But the *Crenshaw* court did not discuss deific decree instructions, since it found Crenshaw unqualified for the defense. The *Cameron* court held that a definition in terms of legal wrong was error in deific decree cases, and agreed with *Cameron*'s argument that right and wrong should be left undefined. *Crenshaw* and *Cameron* together thus establish that no definition should ordinarily be given.[24] While an instruction such as that given in *Potter* specifically referencing the ability to understand an act was morally wrong would not be error, neither is it required.

---

[22] *Potter*, 68 Wn. App. at 144.

[23] The role of free will in deific decree cases has been a source of confusion and debate. *See Potter*, 68 Wn. App. at 144-49 (discussing cases); *see also People v. Serravo*, 823 P.2d 128, 139 (Colo. 1992) (discussing *Crenshaw* at length).

[24] Applin relies on several out-of-state cases in support of his contention that an instruction defining wrongfulness in moral terms is necessary. *See, e.g., Serravo*, 823 P.2d at 139; *State v. Wilson*, 242 Conn. 605, 700 A.2d 633 (1997). Because the Washington Supreme Court has directly addressed this issue, these cases do not guide us here.

Such was the course taken by the trial court here. The instructions were neutral, allowed both parties to argue their theories of the case, and made the relevant legal standard "manifestly apparent to the average juror."[25] The court's deific command instruction was not error.

Applin nonetheless argues that an instruction defining wrongfulness as including moral wrong was needed to correct testimony stating the test solely in terms of legal wrong. Our review of the record persuades us otherwise.

Applin first cites the testimony of the State's psychiatrist, Dr. Hart, contending Hart stated the insanity test solely in terms of legal wrong. But the testimony Applin complains of was elicited by his counsel on cross-examination, and was expressed only as the witness' understanding of the law, not as a statement of the law.[26] This is not grounds for a clarifying instruction.

Applin also cites testimony of other expert witnesses as requiring a corrective instruction. But these witnesses did not make erroneous statements of the test for insanity. State psychiatrist Dr. Leong testified that codefendant Turgeon did not meet the Washington insanity test because Turgeon was "aware of man's laws or the State of Washington's laws at [the time of the murder]," as well as "the rules society had and how he had to act."[27] Leong also testified that Applin had stated in interviews "that he understood it was against the laws of man that it was wrong to kill

---

[25] *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997).

[26] Hart's only testimony relevant to this issue was in response to a question from Applin's counsel:

Q: [I]s it your understanding that the law regarding the insanity defense is that the person's belief prevented that person from comprehending that the act with which they are charged was morally wrong? Is that your understanding of the law? Yes or no?

A: No.

RP (Sept. 26, 2001) at 1767. Applin was apparently attempting to clarify Hart's testimony on direct that the second prong of the insanity defense was "[a]s a result of the mental disease or defect, the individual's incapable or unable to know right from wrong, or know that their act is against the law." RP (Sept. 26, 2001) at 1651.

[27] RP (Sept. 26, 2001) at 1777.

someone, and he took preparations to avoid being picked up after committing the crime."[28] Defense psychiatrist Dr. Gustafson stated on cross-examination that he believed Applin clearly knew his acts were against "the civil law," but couldn't say whether, at the time of the alleged murder, Applin "possessed the ability to tell right from wrong,"[29] although in his report, he had stated his belief that Applin retained this ability.

This testimony contains no erroneous assertions about the test and nothing to cause confusion for the jury. Nor did it diminish the defendant's ability to argue that the insanity definition encompassed the inability to distinguish moral, as well as legal, right from wrong. Applin's counsel stated in closing:

> [I]t's important to understand that this is not right and wrong just in the legal sense, as Dr. Hart would have you believe. This is right and wrong in a legal sense as well as a moral sense. It's either your ability to tell right from wrong legally or your right from wrong morally.[30]

Trial testimony was not misleading or confusing and did not require a special instruction.

Finally, Applin raises various additional objections to the deific decree instruction. He contends the instruction improperly raised the threshold of proof for the insanity defense by requiring him to show that the deific command destroyed not only his ability to tell right from wrong but his free will, and that the "direct command from God" language prevented the jury from considering his subjective, delusional "feeling" that he was God's "chosen vessel" to carry out Jess's murder.

 We decline to address these arguments, because Applin failed to raise them below.[31] Applin's only objection

---

[28] RP (Sept. 26, 2001) at 1782.

[29] RP (Sept. 24, 2001) at 1340.

[30] RP (Sept. 27, 2001) at 1933-34.

[31] *See* RAP 2.5.

to the deific decree instruction was its failure to define wrongfulness in moral terms. Turgeon objected to the "free will" language, and under RAP 2.5, this might suffice to permit Applin to raise the issue, except that Applin twice expressly requested the inclusion of the free will language, and the court included it over Turgeon's objection because Applin insisted upon it. Applin may not challenge what he himself fought to obtain.[32] Applin also submitted an instruction with the direct command language he now finds objectionable; this too, he may not challenge on appeal.

We reject Applin's challenge to the court's jury instructions, and affirm.

KENNEDY and APPELWICK, JJ., concur.

Review denied at 150 Wn.2d 1026 (2004).

---

[32] *State v. Neher*, 112 Wn.2d 347, 352-53, 771 P.2d 330 (1989).