262 P.3d 144 (2011)
STATE of Washington, Respondent,
v.
Douglas S. CHANTHABOULY, Appellant.
No. 39510-0-II.
Court of Appeals of Washington, Division 2.
September 27, 2011.
*147 Rebecca Wold Bouchey, Attorney at Law, Mercer Island, WA, for Appellant.
Kathleen Proctor, Pierce County Prosecuting Atty. Office, Tacoma, WA, for Respondent.
PENOYAR, C.J.
¶ 1 Douglas Chanthabouly appeals his conviction of second degree murder, arguing that because he killed the victim in the delusional belief that he was acting in self defense, he was "unable to tell right from wrong" at the time of the crime. Accordingly, he asserts that (1) the trial court erred by denying his pre-trial motion for a judgment of acquittal on the grounds of insanity, (2) the jury erred by rejecting his insanity defense, and (3) his counsel provided ineffective assistance by failing to propose a jury instruction that a person who kills another in the delusional belief that he was acting in self defense is "unable to tell right from wrong." Chanthabouly also appeals his exceptional sentence of lifetime community custody, arguing that (4) the "destructive and foreseeable impact" aggravating circumstance, which supported the trial court's imposition of the exceptional sentence, is unconstitutionally vague; and (5) insufficient evidence supported the jury's special verdict finding this aggravating circumstance. Finally, Chanthabouly contends that (6) the trial court deprived him of a full opportunity to conduct voir dire, and (7) cumulative error deprived him of a fair trial. We affirm.

FACTS

I. Background
¶ 2 On January 3, 2007, students and staff at Henry Foss High School in Tacoma returned to school after winter vacation. At about 7:25 a.m., Chanthabouly, a Foss student, approached another student, Samnang (Sam) Kok, in a school hallway before the beginning of first period. Chanthabouly pulled out a gun and shot Kok in the head from a distance of about one foot. Kok dropped to the floor. About one to two seconds after the first shot, Chanthabouly fired two more shots into Kok's body. Chanthabouly then walked out of the building. School employees administered CPR (cardiopulmonary resuscitation), but Kok died from his gunshot wounds.
¶ 3 The State charged Chanthabouly with first degree murder, alleging that he caused Kok's death with premeditated intent.[1] The State alleged in the information that "the offense involve[d] a destructive and foreseeable impact on persons other than the victim." Clerk's Papers (CP) at 1; RCW 9.94A.535(3)(r). Before trial, Chanthabouly moved to dismiss the "destructive and foreseeable impact" aggravating circumstance as being void for vagueness. The trial court denied the motion. After a forensic evaluation at Western State Hospital, the trial court found Chanthabouly competent to stand trial.

II. Pre-Trial Motion for Acquittal on Grounds of Insanity
¶ 4 Chanthabouly moved for a judgment of acquittal on the grounds of insanity. See RCW 10.77.080. The hearing on the acquittal motion spanned three days. The State called five witnesses, including four police officers who spoke with Chanthabouly on the day of the crimeWilliam Budinich, Bradley Graham, David DeVault, and Robert Yerburyand Dr. Julie Gallagher, a licensed psychologist and forensic evaluator at Western State Hospital. Chanthabouly's only witness was Dr. Paul Leung, a board-certified psychiatrist and associate professor of psychiatry at Oregon Health and Sciences University. Before proceeding further, we summarize these witnesses' hearing testimony.

A. Police Officers' Testimony
¶ 5 Shortly after the shooting, Budinich received the suspect's physical description *148 and learned that his first name was Douglas. About two hours after the shooting, Budinich saw Chanthabouly, who matched the suspect's physical description, standing on a street corner near the high school. Chanthabouly told Budinich that his name was "Douglas." RP (Feb. 17, 2009) at 37. Budinich arrested Chanthabouly and discovered a 9 mm pistol in his pocket.
¶ 6 After the arrest, Budinich transported Chanthabouly in his patrol car to the central police station, a five to six minute drive. Budinich asked no questions and observed that Chanthabouly was "calm" and "quiet." RP (Feb. 17, 2009) at 40. Chanthabouly asked Budinich how long he had worked as a police officer and told Budinich that he was considering becoming a police officer. At the station, Budinich placed Chanthabouly in Graham's custody. Budinich's entire interaction with Chanthabouly lasted about 15 minutes.
¶ 7 Graham spent about 10 minutes with Chanthabouly in an interview room. He asked Chanthabouly if he needed water or medical aid. Chanthabouly requested water and stated that he did not need medical aid. Graham did not ask about the shooting. According to Graham, Chanthabouly was able to track his questions and respond appropriately. Chanthabouly was "[q]uiet ... cooperative... [and] seemed a little dejected." RP (Feb. 17, 2009) at 50.
¶ 8 Beginning at 9:50 a.m., DeVault and Yerbury interviewed Chanthabouly for "an hour and 15 minutes to an hour and a half." RP (Feb. 18, 2009) at 32. DeVault, the lead interviewer, noticed at the outset that Chanthabouly's hands were "shaking pretty good." RP (Feb. 18, 2009) at 11. Before the detectives advised Chanthabouly of his Miranda[2] rights, DeVault told himwithout referring to a "murder"about what had occurred at the high school. RP (Feb. 18, 2009) at 13. DeVault then asked Chanthabouly if he knew why he was at the police station. Chanthabouly replied, "Yeah, about the murder."[3] RP (Feb. 18, 2009) at 13.
¶ 9 DeVault then read Chanthabouly his Miranda rights. DeVault placed the Miranda form on the interview room's table and asked Chanthabouly to follow along as he read out loud. When DeVault read, "[I]f you're under the age of 18, anything you say can be used against you in juvenile court," Chanthabouly stated, correctly, that he was 18 years old.[4] RP (Feb. 18, 2009) at 14. After DeVault finished reading, Chanthabouly said that he understood his rights and was willing to speak to the detectives.
¶ 10 DeVault asked Chanthabouly to tell him what had happened. Chanthabouly replied that "he didn't know anything about a murder." RP (Feb. 18, 2009) at 17. Chanthabouly explained that he "had been up on the Hilltop looking for his homies" that morning. RP (Feb. 18, 2009) at 18. A short time later, he admitted to DeVault that he "had been to the school earlier that morning but just to drop off his books." RP (Feb. 18, 2009) at 18.
¶ 11 DeVault asked whether Chanthabouly had any personal problems. Chanthabouly said he had no problems, but he stated, without specifics, that he was concerned about his brother Dao[5]. DeVault followed up, referring to Dao as Chanthabouly's older brother. According to DeVault, Chanthabouly "stopped me and told me that he was the oldest and that [Dao] was his younger brother." RP (Feb. 18, 2009) at 20.
¶ 12 Because DeVault had learned from police records that Chanthabouly might have been a victim of gang activity in the past, DeVault asked Chanthabouly whether he had problems with gangs. Chanthabouly replied that he had "trouble with all kinds of gangs and all sets of the Bloods," but he did not give any particulars. RP (Feb. 18, 2009) at 20.
¶ 13 Later in the interview, DeVault said that he knew that Chanthabouly had shot the *149 victim. According to DeVault, Chanthabouly "did not deny it." RP (Feb. 18, 2009) at 21. When DeVault asked why the shooting had occurred, Chanthabouly told him that "it just happened" and that it did not involve a girl, money, or a question of respect. RP (Feb. 18, 2009) at 22. Chanthabouly said he could not remember how many times he had pulled the trigger. At another point, Chanthabouly told DeVault that if he explained why he shot Kok, "it would be in the news" and his mother's house "would be sprayed" in a drive-by shooting. RP (Feb. 18, 2009) at 26.
¶ 14 During the interview, Chanthabouly identified the victim as "Samnang" and stated that "he knew him but he didn't hang out with him." RP (Feb. 18, 2009) at 21. Chanthabouly told DeVault that Kok did not have a gun at the time of the shooting. Chanthabouly did not remember where he shot Kok and did not remember if he said anything to Kok. When DeVault informed Chanthabouly that Kok had died, Chanthabouly said, "I guess my homies are going to come after me now." RP (Feb. 18, 2009) at 30. Chanthabouly asked whether "this was a death penalty" issue and stated that "it didn't matter, he would probably die in prison anyway or get killed in prison." RP (Feb. 18, 2009) at 30.
¶ 15 When DeVault asked about the gun, Chanthabouly replied that he "mostly carries a gun to school ... for protection." RP (Feb. 18, 2009) at 17. Chanthabouly told DeVault that the gun was a "9mm manufactured by Interarms" and informed DeVault that the manufacturer was out of business. RP (Feb. 18, 2009) at 24.
¶ 16 Yerbury characterized Chanthabouly's interview demeanor as "responsive," "calm," and "soft spoken." RP (Feb. 18, 2009) at 139. According to Yerbury, "[Chanthabouly] was engaged in our conversation in our interview... he was tracking what we were asking of him." RP (Feb. 18, 2009) at 139. Yerbury did not recall any long pauses between DeVault's questions and Chanthabouly's responses. DeVault also observed that Chanthabouly did not appear to be responding to any internal stimulus.

B. Dr. Gallagher's and Dr. Leung's Testimony
¶ 17 Dr. Gallagher, who testified for the State, performed a forensic evaluation of Chanthabouly under a trial court order. See RCW 10.77.060. The trial court admitted her forensic psychological report into evidence at the hearing. To complete the report, Dr. Gallagher interviewed Chanthabouly on eight separate occasions between June 6, 2007, and November 7, 2008, for a total of about 12 hours. During the interviews, Chanthabouly had "logical, goal-oriented" thought processes and was able to answer questions "in a relevant manner." RP (Feb. 18, 2009) at 79. He also exhibited signs of thought blocking.[6] Several of these interviews were to assess Chanthabouly's competency to stand trial; at the final two interviews, on October 31, 2008, and November 7, 2008, she asked him to describe the shooting. For her report, she also reviewed and considered several other sources of information, including psychological test results, psychological reports, medical and educational records, and discovery materials.
¶ 18 Dr. Leung, who testified for the defense, interviewed Chanthabouly for about two hours on January 26, 2007, and for about two hours on June 29, 2007. Dr. Leung reviewed some of the same psychological reports, medical and educational records, and discovery materials as Dr. Gallagher. The trial court admitted his psychological report into evidence at the hearing.
¶ 19 Dr. Gallagher and Dr. Leung each testified about Chanthabouly's description of his life leading up to the shooting. Chanthabouly reported that he was "greatly distressed through the winter break" and "heard a lot of voices, accusatory in nature." RP (Mar. 4, 2009) at 17. He believed that "gangs" were about to kill him. RP (Mar. 4, 2009) at 17. He stopped taking his medication, locked himself in his room, and stayed *150 awake for days and nights on end. He heard voices that told him to "watch his back," and he talked back to the voices. Ex. 5 at 4. He saw "images of people with knives." Ex. 5 at 4. He believed that when he returned to school after winter break, "something bad" was going to happen to him and that nobody could protect him. Ex. 5 at 4.
¶ 20 During the night before the shooting, he said, "I was hearing all these voices saying they was gonna kill me. I was seeing a gun pointed at me. They said they was gonna do it in the schoolyard, gonna stab me so no gunshots and no hit." Ex. 2 at 24. Chanthabouly "felt he needed to protect himself," so he took a gun from a drawer in his brother's bedroom. RP (Mar. 4, 2009) at 18.
¶ 21 On the way to school the next morning, Chanthabouly reported that he saw "gang members" and "people pointing guns" at him. Ex. 2 at 25. He heard voices saying that they would hurt his younger brother. He believed that a "group of Asians wearing red or black" would stab him. Ex. 5 at 5.
¶ 22 At the October 31, 2008, interview, Chanthabouly told Dr. Gallagher what happened after he arrived at school on January 3, 2007:
I walked through the hall and then Sam came up to me. I was kinda paranoid. He said "What's up" to me. I remember why I got in a fight when I see him he said, "What's up Blood" to me. I said "I ain't no gang member." He got mad at me. I thought Sam was part of that group. He was a gang member. I knew that. I wasn't so sure. Then I shot him.
But I gotta take it back to what I was hearing. You know, it gets kinda chopped up. I was paranoid, ... I thought he was part of the people trying to kill me, seeing them as gang members. That's why he got shot. I was hearing voices telling me to say things cause the last two shots, they told me something right after he got shot in the head. Backed up, I was scared and, uh, that's how it happened. I just ran.... I was like, I don't know how I feel, how I was thinking after that cause I didn't know what was reality really.
Ex. 2 at 25 (first alternation in original).
¶ 23 Chanthabouly told Dr. Gallagher he ran from the scene "cause if you standing at the scene [the police] gonna walk up and shoot you in the head." Ex. 2 at 25 (alteration in original). Dr. Gallagher asked Chanthabouly what was going through his mind after he fled the scene. Chanthabouly responded:
You mean those two hours when I was just sitting there? I was like, I know I'm going to go to prison. I'm going to get killed for this but I didn't care though. I said I was just trying to stop this.... I knew it was against the law but damn, it was like a sacrifice for your own life. It didn't matter.
Ex. 2 at 25.
¶ 24 At the November 7, 2008, interview with Dr. Gallagher, Chanthabouly described the shooting as follows:
I was paranoid about people trying to kill me and stuff. I was seeing like gangsters, seeing like Bloods and stuff. He came up to me and replied in the fashion, said, "What up Blood?" to me. Kinda sparked my mind he was the one trying to plant all the stuff I was hearing. I capped him, shot him in the head, thought he was gonna do something to me all the way, I was gonna die. Then I got scared. I was like, I got scared. I don't know what happened. I got scared back, then shot three more times but the report says I shot four, three, then I looked back. Actually I don't know cause I started running. That's what I did.
Ex. 2 at 26.
¶ 25 Chanthabouly explained that, a week earlier, he had heard voices from people dressed in red who said they were going to kill him. When Dr. Gallagher asked what these people looked like, Chanthabouly explained that they "wear red and look like gang bangers" and that "the Bloods wear red." Ex. 2 at 26. He then described the shooting again:
[A]ctually I was kinda paranoid because there was a group of kids right down the *151 corner from my first period. They was all dressed up in red. I walked past them, then I stood down the hall across from them. Then Sam came out over there from the same direction. He came over, he said, "What's up, Blood?" to me, thought he was gonna do something, thought he was gonna hurt me, so I pulled out the gun. I shot him. I was pretty damn paranoid too.
Ex. 2 at 26.
¶ 26 Dr. Gallagher asked Chanthabouly whether he thought, at the time of the shooting, that it was wrong to shoot somebody. He answered:
Nah because I was hearing voices saying they was gonna shoot me. First they say they was gonna stab me. They said if I pulled a gun they was gonna shoot me and if I didn't pull the gun they was gonna stab me to death.
Ex. 2 at 27. He told Dr. Gallagher that he "had to do it you know, I wouldn't have did it if I didn't have to." Ex. 2 at 27. He knew he would be caught because "[t]here was 40 kids looking, staring." Ex. 2 at 27.
¶ 27 At his first meeting with Dr. Leung on January 26, 2007, Chanthabouly told Dr. Leung that he did not shoot Kok. At their June 29, 2007 interview, Dr. Leung reported that Chanthabouly described the incident as follows:
When Sam came up to him in the school, the voice in his head told him that Sam was one of the group and he thought Sam was saying to him, "What's up blood." At that moment, he shot Sam. The word "blood" reminded him of the sign of the people in the gang who had attacked him when he was 16 years old back in ninth grade. He thought Sam was there to stab him. He also remembered that he knew Sam was never in the gang. He reported that he knew Sam as a friend. He did not know why Sam came off at him that way.
Ex. 5 at 5.
¶ 28 Dr. Gallagher's report also summarizes the observations of Pierce County jail staff on January 3 and 4, 2007. At 1:00 p.m. on January 3, a mental health professional observed that Chanthabouly was "[w]ell groomed, polite, responsive" and "[a]ppear[ed] dazed." Ex. 2 at 22. She noted that he answered questions in a timely manner and denied auditory or visual hallucinations. On January 4, Chanthabouly reported visual and auditory hallucinations, and a mental health professional stated that he appeared to be "internally preoccupied." Ex. 2 at 22. That mental health professional also observed that when she asked Chanthabouly whether he wanted to speak to his mother, he made a "rather odd aside about `She probably has a lot of respect for human life.'" Ex. 2 at 22.

C. Expert Opinion About Chanthabouly's Ability to "Tell Right from Wrong"
¶ 29 At the hearing, Dr. Gallagher and Dr. Leung each provided expert testimony about whether Chanthabouly met the legal definition of insanity. See former RCW 9A.12.010 (1975).[7] Both agreed that Chanthabouly suffered from paranoid schizophrenia,[8] a mental disease. Additionally, each concluded that Chanthabouly was able to perceive the nature and quality of his acts[9] at the time of the shooting. Dr. Gallagher and Dr. Leung disagreed, however, on whether Chanthabouly was able to perceive right from wrong at the time of the shooting.
*152 ¶ 30 Dr. Gallagher concluded that Chanthabouly did not meet the legal definition of insanity because he was able to tell right from wrong at the time of the shooting. Her written report explains the basis for this conclusion:
It is clear that Mr. Chanthabouly knew that his actions were legally wrong at the time of the offense. During the interview for this evaluation, he stated, "I knew it was against the law but damn, it was like a sacrifice for your own life. It didn't matter." His statements also demonstrated an awareness of the potential legal consequences of his actions. He said, "I knew I was gonna get caught after that. There was 40 kids looking, staring." Furthermore, Mr. Chanthabouly described his thought process during the two hours between the offense and his arrest. He said, "I was like, I know I'm going to go to prison. I'm going to get killed for this but I didn't care though." When taken into custody by the police, he asked if Washington State had the death penalty. Taken together, this demonstrates a clear awareness of the legal wrongfulness of the act.
Mr. Chanthabouly's statements appear to indicate that he felt he had no choice but to shoot the victim ("I had to do it you know, I wouldn't have did it if I didn't have to.") He attributes his lack of choice to his paranoia at the time and his belief at the time that the victim was part of a group of gang members that was going to kill him and his brother. By his own account, he did not hear the victim directly threaten him and did not see a weapon (and in fact the victim was unarmed). In essence, his own account is that he was taking a preventative step based on a perceived general threat to his life and that of his brother that day. His statements appear to indicate that at the time he believed that he was engaging in behavior that was legally wrong, but was morally justified based on this general threat. However, Mr. Chanthabouly's comment to the jail staff that he did not wish to speak with his mother due to her probable "respect for human life" implies that he may have also understood that society would consider his act morally wrong.
Ex. 2 at 30.
¶ 31 Dr. Gallagher's testimony at the hearing about whether Chanthabouly was able to tell right from wrong was consistent with her written report. Additionally, she testified that Chanthabouly's flight from the crime scene demonstrated a "consciousness of guilt," indicating that "he understood that he had done something that could have very negative consequences for himself." RP (Feb. 18, 2009) at 68, 71. She noted that his statements to police about going to prison "for a long time" suggested that he understood that what he did was legally wrong. RP (Feb. 18, 2009) at 73. Dr. Gallagher also testified that she asked Chanthabouly what his mother would have done if she had known her son was carrying a gun on the morning of the shooting. Chanthabouly had replied, "You know what my mom would do. My mother would do what a mother would do. She would slap me. That's not even a logical question." RP (Feb. 18, 2009) at 74-75. Dr. Gallagher said this statement indicated "[t]hat he did understand that he was doing something wrong." RP (Feb. 18, 2009) at 75. On cross-examination, Dr. Gallagher agreed that at the time of the offense, Chanthabouly had a delusion that "there were gang-bangers, gang members, who were trying to kill him." RP (Feb. 18, 2009) at 85.
¶ 32 Dr. Leung concluded that Chanthabouly was unable to tell right from wrong at the time of the crime. As he explained in his written report:
It is my opinion that at the time of the alleged act Mr. Douglas Chanthabouly was suffering the acute recurrence of a mental disease, namely Chronic Paranoid Schizophrenia. As a result of the mental disease he was unable to tell right from wrong with reference to the act charged. He thought he was in imminent danger to be harmed by the victim. He took action to defen[d] himself which he did not know it was wrong to do so because he was just imagining all of this in his mind which was *153 gravely affected by the psychotic process of the mental illness he had at the time.
Ex. 5 at 6.

D. Trial Court's Denial of Acquittal Motion
¶ 33 On March 5, 2009, the trial court orally denied Chanthabouly's motion for a judgment of acquittal on the grounds of insanity. Because the trial court did not enter findings of fact or conclusions of law in its written order denying the acquittal motion, we quote the trial court's oral ruling at length:
So the real issue is at the time this occurred, January 3, 2007, was he able to distinguish right from wrong, was he unable to tell right from wrong with reference to the particular act charged.... [Defense counsel] seems to be ... asking for a bit of a more subjective standard that if, in fact, Mr. Chanthabouly, acting on the delusions as part of his mental disease, really thinks he's defending himself, then he should be found not guilty by reason of insanity.... I don't think [that] is the law in Washington.
The standard under, at least, State v. Crenshaw[[10]] is a societal definition of right from wrong, not an individual subjective definition. So the issue is, was he unable to tell that society would find or the law or the authorities would find this decision wrong.
And I think there is a good deal of evidence that leads me to conclude that, in fact, he was able to tell the difference between right and wrong with societal morals at the time.
. . . .
With respect to whether he was able to tell the difference between right and wrong at the time, there's no one magic thing that convinces me. And we didn't have any testimony, as I recall, about the immediate time of the shooting.
. . . .
There were quite a few observations made by police officers not too long afterwards. These are police officers. They're not psychiatrists and they're not psychologists. They probably don't have specialized training in psychology or medicine, but they have training in observation, and the four that we heard from were very experienced.
. . . .
All the officers consistently found that Mr. Chanthabouly was cooperative, calm, tracked their questions. And interestingly, none of them described anything that would resemble thought blocking, which we heard from Dr. Gallagher. He corrected the officers as to ages.
He also did a number of things to try to conceal his involvement or hide to the extent his involvement, which is consistent with him knowing he's in trouble for breaking the law, that he did something wrong. He lied to the police at one point. He said he wasn't at school; he was up at the Hilltop looking for his homies. I think he realized that they didn't believe that, and he modified it and said he did go to school but just to get his books or drop off his books.
They confronted him. At one point, I think DeVault asked him if he knew why he was here, why they were interviewing him, and he said, Yeah, about the murder. He didn't say about the self-defense or about the shooting; he said about the murder. He expressed concern to Dr. Gallagher that if he stayed at the scene the police, who are representatives of society, might shoot him, and that in one sense is maybe evidence of paranoia, I suppose, or delusional belief. It's also evidence that the authorities, the police, think he did something wrong and might take action against him.
He made no claim of self-defense during any of the interviews. Again, he was tracking. He asked at one time whether Washington had a death penalty, so he, I think, realized his actions could lead to some penalty against him. He said he might die in prison, so he understood that prison, a penalty, was a consequence of his act.

*154 In his interviews with Dr. Gallagherhe apparently had eight different interviews, a total of about 12 hours over a period of timehe apparently told her at one point, on page 23, I believe, of the transcript, that he knew at the time that it was against the law and he indicated to her also that he was surprised that she would even ask about his mother. He said his mother, if she had known he was doing something, would have slapped him, would have stopped him.
So I conclude that Mr. Chanthabouly was able to tell right from wrong with reference to the particular act, the shooting of Mr. Kok, and I conclude that the defense has not established, has not convinced me by a preponderance of the evidence that the motion for acquittal by reason of insanity should be granted, so I'm going to deny the motion for acquittal by reason of insanity.
RP (Mar. 5, 2009) at 85-90.

III. Voir Dire
¶ 34 Jury selection spanned four days. On the first day, the trial court asked the venire to fill out questionnaires. On the second day, the trial court permitted individualized voir dire of more than 50 venire members who had heard about the case or wanted private questioning on certain issues.
¶ 35 At the end of the second day, the trial court told the parties that it wished to empanel the jury by the following afternoon. The trial court said that it would allow each side to ask two rounds of questions the next day and "then see where we are after that." RP (Mar. 10, 2009) at 361.
¶ 36 On the third day, before beginning voir dire for the day, the trial court reiterated that it would allow a 45-minute round for each side followed by a shorter round of questions. The attorneys proceeded to question the full venire. After each side had completed two rounds of questioning, the State informed the trial court that it had no further questions. The trial court gave the defense a third and fourth round of questioning.
¶ 37 During the fourth round, defense counsel asked the venire several questions about gun ownership, including asking one juror who did not own a gun, "So you wouldn't want one to have one to defend yourself if you were in a situation where you felt the need to?" RP (Mar. 11, 2009) at 515. Two other venire members discussed the issue of self defense or "protection" when speaking about their guns during the open-ended discussion that followed. RP (Mar. 11, 2009) at 516. Later, defense counsel asked, "Does anybody believe that you should be able to defend yourself with a weapon?" RP (Mar. 11, 2009) at 521. The State objected. The trial court sustained the objection, noting, "I don't see how it has much to do with this case." RP (Mar. 11, 2009) at 521. After a few more questions, the trial court asked the defense to "wind it up" for the day. RP (Mar. 11, 2009) at 526.
¶ 38 On the morning of the fourth day, Chanthabouly moved for a mistrial, arguing that he had not been allowed to ask about gangs or "whether ... there are jurors that don't like people that are Asian." RP (Mar. 12, 2009) at 538. Additionally, Chanthabouly argued that the trial court should have permitted him to ask questions about self defense. The trial court denied the motion in an oral ruling, noting that the issue of gangs was not a major issue and that it had not limited the defense from asking questions about race. The trial court did not specifically address Chanthabouly's argument about self defense in its oral ruling.

IV. Motion in Limine on Self Defense
¶ 39 Before trial, the State moved in limine to prevent Chanthabouly from presenting opinion testimony by either Dr. Gallagher or Dr. Leung that "the defendant's actions essentially form the basis for a self-defense claim." RP (Mar. 12, 2009) at 577. The State argued that this would misrepresent self defense as involving a subjective, rather than an objective, standard. Defense counsel explained that its theory of the case was that, at the time of the offense, Chanthabouly had a "delusional belief that he was going to be stabbed or shot that morning and that he acted in his delusional belief that he was defending himself." RP (Mar. 12, 2009) at 578. The following colloquy occurred:

*155 [DEFENSE]: If we're not allowed to argue this, Your Honor
THE COURT: Not allowed to argue what?
[DEFENSE]: That our client was delusional. All of the things that I've indicated, Your Honor, that he believed he was acting in self-defense, that he was defending himself and his brother.
[THE COURT]: His delusional belief isn't self-defense. Isn't the law in Washington somewhat objective? You can certainly argue it's part of his delusion.
[DEFENSE]: That's what we're intending to argue, Your Honor. We're not arguing that he had an actual self-defense claim.... What we're arguing is he believed, his delusional system involved the fact that he believed he was acting in self-defense, and I think we can certainly explain that to the jury. We're not going to be asking them and there's not going to be any instructions that he be found not guilty because of self-defense.
RP (Mar. 12, 2009) at 578-79.
¶ 40 The trial court ruled on the State's motion in limine as follows:
Well, I'm going to grant this in part and deny it in part. I am going to exclude argument that he was acting in self-defense. That's not an issue. And I'm going to exclude testimony from others that he was acting in self-defense. I will allow testimony on what the substance of his delusions were and what the substance of the hallucinations that he may have been having were. That is part of the defense here, but it isn't self-defense; it's delusion.
RP (Mar. 12, 2009) at 581.

V. Trial
¶ 41 All of the police officers who testified at the motion hearing, except Yerbury, testified at trial. The officers' trial testimony was generally consistent with their earlier testimony at the motion hearing. DeVault also testified that he asked Chanthabouly during the interview whether he heard "voices telling him to do it," to which Chanthabouly replied, "It's all on me." RP (Mar. 16, 2009) at 765.
¶ 42 Several students, teachers, and administrators who saw or heard the shooting testified at trial. Ciarra McNealey stood three to four feet from Chanthabouly when she saw him pull out a gun. Before the first shot, McNealey heard him ask Kok, "Now what, fool?" RP (Mar. 17, 2009) at 1041. McNealey did not hear Kok say anything. Nicole Middlebrook stood about 8 to 10 feet from Chanthabouly and Kok at the time of the shooting. Before the shooting, she did not hear them exchange any words. After Kok fell to the ground following the first shot, she heard Chanthabouly say, "Boom, mother fucker," before firing the second shot. RP (Mar. 16, 2009) at 917. Middlebrook sought medical treatment after the incident because "[s]ome of the blast from the shot" went into her eyes. RP (Mar. 16, 2009) at 919.
¶ 43 The State asked several of the students, teachers, and administrators about how the shooting had affected them. The principal, who had informed Kok's family of his death, testified that no "training or experience can ever prepare you to ... tell a family that their son had been killed while they're [sic] under your supervision ... it continues to affect me profoundly." RP (Mar. 16, 2009) at 847. He testified that "a handful of students" decided not to come back after the shooting. RP (Mar. 16, 2009) at 847. An assistant principal testified that he thought about the shooting "just about every day" and walked around the school building each day to make sure it was safe. RP (Mar. 12, 2009) at 625. Another assistant principal testified that "there's always that insecurity in a place where something like this happens." RP (Mar. 16, 2009) at 902. The school nurse testified that, "[I]t's just hard ... [k]nowing that we lost one of our students right there in school." RP (Mar. 12, 2009) at 668. One student who had observed the shooting sought counseling afterward and testified that the shooting "affected [her] tremendously" and made her realize that she could "die at any time." RP (Mar. 12, 2009) at 684. A teacher testified that the shooting caused him insomnia and made him more distant from family and friends who had not experienced the shooting.
*156 ¶ 44 The defense called several witnesses, including Chanthabouly's mother and sister, to testify about his mental illness. Dr. Gallagher and Dr. Leung also testified for the defense in a manner consistent with their earlier testimony at the motion hearing.
¶ 45 The trial court gave the jury the pattern instruction on the insanity defense. Compare CP at 97 with 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 20.01, at 336 (3d ed. 2008) (WPIC). The jury convicted Chanthabouly of the lesser included offense of second degree murder. The jury returned a special verdict, finding that the murder "involve[d] a destructive and foreseeable impact on persons other than the victim." CP at 149.
¶ 46 The trial court sentenced Chanthabouly to 220 months, the maximum sentence within the standard range, plus a 60-month firearm enhancement. Additionally, based on the jury's special verdict, the trial court sentenced Chanthabouly to an exceptional sentence of lifetime community custody.[11]
¶ 47 Chanthabouly appeals his conviction and sentence.

ANALYSIS

I. Denial of Motion of Acquittal by Reason of Insanity
¶ 48 Chanthabouly first assigns error to the trial court's denial of his acquittal motion, arguing that "he committed the offense while under the delusion that he was acting in self defense." Appellant's Br. at 15. In his view, the insanity defense's "right from wrong" standard requires the fact finder to determine whether the actor could tell that his or her act was "wrong in a moral sense." Appellant's Br. at 16. He contends that the trial court incorrectly applied this standard because its basis for denying his acquittal motion was his acknowledgment that "what he did was against the law." Appellant's Br. at 20. He concedes that, in some situations, "moral wrong and legal wrong are one and the same," but he asserts that "this is not true in the case of self defense" because "it is not morally wrong to act in defense of your life." Appellant's Br. at 19, 20; see RCW 9A.16.020(3). Because the trial court properly denied the acquittal motion, these arguments fail.

A. Motion for Acquittal on Grounds of Insanity
¶ 49 A defendant may move the trial court for a judgment of acquittal on the grounds of insanity. RCW 10.77.080. Because the law presumes that an individual is sane at the time that the individual commits a crime, a defendant asserting the insanity defense bears the initial burden of producing evidence of insanity. State v. Box, 109 Wash.2d 320, 322, 745 P.2d 23 (1987). Additionally, a defendant has the burden of persuading the trial court by a preponderance of the evidence that he or she was insane at the time of the charged offense. RCW 10.77.080.
¶ 50 Washington follows the M'Naghten[12] rule for determining insanity, which has been codified at RCW 9A.12.010. State v. Klein, 156 Wash.2d 103, 113, 124 P.3d 644 (2005). To establish the insanity defense, a defendant must establish by a preponderance of the evidence that:
(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
(a) He was unable to perceive the nature and quality of the act with which he is charged; or
(b) He was unable to tell right from wrong with reference to the particular act charged.

Former RCW 9A.12.010 (emphasis added); see also RCW 10.77.030(2). Because a verdict of not guilty by reason of insanity completely absolves a defendant of any criminal responsibility, the insanity defense "is available only to those persons who have lost contact with reality so completely that they are beyond any of the influences of the criminal law." State v. Crenshaw, 98 Wash.2d 789, 793, 659 P.2d 488 (1983) (quoting State v. *157 White, 60 Wash.2d 551, 590, 374 P.2d 942 (1962)).

B. Standard of Review
¶ 51 Before addressing Chanthabouly's contention on the merits, we first must clarify the appropriate standard of review of a trial court's denial of a motion for a judgment of acquittal on the grounds of insanity under RCW 10.77.080. When reviewing a trial court's denial of a motion for acquittal on grounds of insanity, we first determine whether substantial evidence supports the challenged facts that form the basis of the trial court's ruling. See State v. Sommerville, 111 Wash.2d 524, 533-34, 760 P.2d 932 (1988). If, as is preferable,[13] the trial court provides oral or written findings to support its ruling on the motion, we review those findings for substantial evidence. See Sommerville, 111 Wash.2d at 534, 760 P.2d 932. After determining whether substantial evidence supports the trial court's factual findings, we must then determine whether these facts support the trial court's conclusion that the defendant failed to prove insanity by a preponderance of the evidence. See Sommerville, 111 Wash.2d at 534, 760 P.2d 932.[14]

C. Trial Court Properly Denied Acquittal Motion
¶ 52 Significantly, Chanthabouly does not argue that substantial evidence does not support the facts that the trial court relied on in its oral ruling. Therefore, these facts are verities on appeal and we need not review them for substantial evidence. State v. Shaver, 116 Wash.App. 375, 380, 65 P.3d 688 (2003) (unchallenged oral findings are verities) (citing State v. Hill, 123 Wash.2d 641, 644, 870 P.2d 313 (1994)). Chanthabouly asserts, however, that the trial court could not have concluded from these unchallenged facts that he failed to prove, by a preponderance of the evidence, that he was "unable to tell right from wrong."
¶ 53 Chanthabouly's argument fails because it relies on two closely related but flawed premises. First, he suggests that when the trial court found that Chanthabouly understood the wrongfulness of his conduct, it denied his motion based only on his admissions that he knew that shooting Kok was against the law. Second, he believes that his actions and statements after the murder demonstrate only that he knew that his act was legally wrong, telling us nothing about his ability to perceive the moral wrongfulness of his act. Neither premise survives scrutiny.
¶ 54 As to the first premise, Chanthabouly is correct that much of the trial court's ruling focused on statements that Chanthabouly made suggesting that he knew his actions were legally wrong. Specifically, the trial court observed that (1) he used the term "murder" rather than "self-defense" or "shooting" when responding to an officer's question about why the police were interviewing him, (2) he stated that police might have shot him if he had stayed at the crime scene, (3) he asked about the death penalty during the police interview, (4) he told police that he "might die in prison" and thus understood that prison could be a consequence of his act, and (5) he told Dr. Gallagher that he knew at the time of the crime that shooting Kok was against the law. RP (Mar. 5, 2009) at 89.
¶ 55 Chanthabouly, however, misapprehends the balance of the trial court's extensive oral ruling. Contrary to his assertions, the trial court relied on more than his admissions that he knew the shooting was unlawful in order to conclude that he failed to demonstrate, by a preponderance of the evidence, an inability "to tell right from wrong." First, the trial court relied on Chanthabouly's responsive demeanor during the police interview shortly after the murder. Chanthabouly *158 was "cooperative," "calm," and able to track the officers' questions. RP (Mar. 5, 2009) at 88. He "corrected the officers as to ages" and did not appear to exhibit signs of thought blocking. RP (Mar. 5, 2009) at 88. Second, the trial court observed that he did not claim self defense at the interview. Third, the trial court noted that he had tried to hide his involvement when he fled the crime scene and lied to police about his whereabouts and activities that morning. Finally, the trial court relied on his statement that his mother would have slapped him if she had known he was carrying a gun on the morning of the shooting. In sum, the trial court's conclusion that Chanthabouly understood the wrongfulness of his conduct was based on far more than his admissions that he knew that shooting Kok was against the law.
¶ 56 As to his second premise, Chanthabouly argues that the trial court should not have relied on evidence suggesting that he knew his actions were legally wrong, positing that such evidence is essentially irrelevant to determining whether he was "unable to tell right from wrong" under former RCW 9A.12.010(1)(b). But as our Supreme Court observed in its seminal Crenshaw decision, "legal wrong" is often synonymous with "moral wrong." 98 Wash.2d at 797, 659 P.2d 488. As the court noted, the meaning of "moral wrong" in the M'Naghten context refers to society's morals, not an individual's morals, and "[t]he law is, for the most part, an expression of collective morality." Crenshaw, 98 Wash.2d at 797, 799, 659 P.2d 488; accord People v. Schmidt, 216 N.Y. 324, 110 N.E. 945, 949 (1915) ("Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals.") Our Supreme Court favorably cited one scholar's view:
[S]ince by far the vast majority of cases in which insanity is pleaded as a defense to criminal prosecutions involves acts which are universally regarded as morally wicked as well as illegal, the hair-splitting distinction between legal and moral wrong need not be given much attention.
Crenshaw, 98 Wash.2d at 799, 659 P.2d 488 (citing Sheldon Glueck, Mental Disorder and the Criminal Law, 184 (1925)).
¶ 57 Turning to the merits of the trial court's decision to deny the motion for acquittal, we conclude that the trial court's oral findings justify its conclusion that Chanthabouly failed to meet his burden of persuasion on the acquittal motion. By fleeing the crime scene and lying to police, Chanthabouly attempted to conceal his involvement in the shooting. Chanthabouly's statement that his mother would have slapped him if she had known that he carried a gun to school that morning, and his statement that police officers would have shot him had they found him at the crime scene, each suggest that he understood other people's moral judgments. See Crenshaw, 98 Wash.2d at 798, 659 P.2d 488 (citing expert's testimony that defendant's awareness "that he is in conflict ... with people" to support the proposition that he "knew his acts were morally wrong from society's viewpoint."). The trial court left unsaid that a mother's slap is a moral punishment, not a legal one. Additionally, the trial court properly considered Chanthabouly's demeanor, responsiveness, and failure to claim self defense at the police interview shortly after the murder to determine whether he was able "to tell right from wrong" at the time of the shooting. Lastly, as the preceding paragraph explains, the trial court could reasonably infer from Chanthabouly's statements admitting or suggesting that he knew that he violated the law at the time of the shootingincluding his death penalty question and his prison commentthat he understood that his actions were wrong from society's viewpoint.
¶ 58 We note that Chanthabouly repeatedly cites the same four pages from the record to support his contention that "the evidence is uncontroverted that [he] was acting under a delusion that [Kok] was about to kill him unless he first acted to shoot him ... in self defense." Appellant's Br. at 19 (citing RP (Feb. 18, 2009) at 69; RP (Mar. 23, 2009) at 1348; RP (Mar. 25, 2009) at 1634, 1636); see also Appellant's Br. at 5, 11, 20, 24 (citing RP (Feb. 18, 2009) at 69; RP (Mar. 23, 2009) at 1348; RP (Mar. 25, 2009) at 1634, 1636). *159 Only one of these citations is to the motion hearing and, therefore, relevant to our analysis here. Specifically, Chanthabouly cites Dr. Gallagher's testimony:
[W]hen he described his motivation, it was to protect himself and his family from people that he believed were going to kill him based on auditory hallucinations he was having and paranoid delusions, so what he described was taking a gun to school with the intent of preventing this from happening and basically shooting the victim as a peremptory attempt to protect his own life and that of his brother.
RP (Feb. 18, 2009) at 68-69. As the trial court's detailed analysis demonstrates, however, this evidence is far from "uncontroverted." Chanthabouly's actions, demeanor, and statements after the shooting contradict the self-serving account that he provided to Dr. Gallagher. Accordingly, the trial court was entitled to place greater weight on testimony that undermined this account in order to conclude that Chanthabouly had failed to meet his burden of persuasion.
¶ 59 Finally, a detailed comparison between Crenshaw and the instant case does not alter the foregoing analysis. Crenshaw supports the conclusion that a defendant's admission of legal wrongdoing is relevant to the trial court's determination of whether a defendant is able "to tell right from wrong" at the time of the crime. In Crenshaw, our Supreme Court affirmed the first degree murder conviction of a man who killed his wife because he believed that she had committed adultery; he testified that, according to his religious beliefs, it would have been improper not to kill an adulterous wife. 98 Wash.2d at 791-92, 659 P.2d 488. The appellant argued that the trial court erred by including the following language in the insanity defense instruction: "What is meant by the terms `right and wrong' refers to knowledge of a person at the time of committing an act that he was acting contrary to law." Crenshaw, 98 Wash.2d at 793, 659 P.2d 488. Our Supreme Court rejected this argument, holding:
We find this instruction was not reversible error on three, alternative grounds: (1) The M'Naghten opinion amply supports the "legal" wrong definition as used in this case, (2) under these facts, "moral" wrong and "legal" wrong are synonymous, therefore the "legal" wrong definition did not alter the meaning of the test, and (3) because Crenshaw failed to prove other elements of the insanity defense, any error in the definition of wrong was harmless.
Crenshaw, 98 Wash.2d at 793-94, 659 P.2d 488; cf. State v. Cameron, 100 Wash.2d 520, 526-27, 674 P.2d 650 (1983) (same instruction is error if defendant presents evidence that his free will has been subsumed by a belief that he is acting under a direct command from God).
¶ 60 In its lengthy discussion of its first alternative holding, the Crenshaw court acknowledged that it had not previously adopted any definition of "wrong" for the M'Naghten test. 98 Wash.2d at 794 n. 1, 659 P.2d 488. The court observed that "apparent inconsistencies in the original M'Naghten case" had led legal scholars to dispute the meaning of "wrong" in the M'Naghten context:
In response to the House of Lords first question, the justices replied that if an accused knew he was acting contrary to law but acted under a partial insane delusion that he was redressing or revenging some supposed grievance or injury, or producing some supposed public benefit, "he is nevertheless punishable ... if he knew at the time of committing such crime that he was acting contrary to law; ... the law of the land." In this answer, the justices appear to approve the legal standard of wrong when there is evidence that the accused knew he was acting contrary to law.
This has been characterized as inconsistent with the justices' response to the second and third questions, regarding how a jury should be instructed on the insanity defense:
"If the question were to be put [to a jury] as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to *160 lead to a conviction; whereas the law is administered upon the principle that every one must be taken conclusively to know it, without proof that he does know it. If the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable; and the usual course therefore has been to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong: and this course we think is correct, accompanied with such observations and explanations as the circumstances of each particular case may require."
This response appears to require both that the accused be "conscious that the act was one which he ought not to do" and that the act be "contrary to the law."
Crenshaw, 98 Wash.2d at 794-95, 659 P.2d 488 (alterations in original) (citation omitted) (quoting M'Naghten's Case, (1843) 8 Eng. Rep. 718 (H.L.) 722; 10 Clark & Fin. 200, 210).
¶ 61 The Crenshaw court concluded that M'Naghten's inconsistencies were reconcilable under the specific facts of that case. 98 Wash.2d at 795, 659 P.2d 488. Most relevant here, the court noted that the basis for the M'Naghten's justices' misgivings about defining "wrong" as "legal wrong" in jury instructions was absent when a defendant had demonstrated, as Crenshaw did, "that he knew the illegality of his acts." Crenshaw, 98 Wash.2d at 796, 659 P.2d 488. That is because, in such a case, there would be no danger that the jury would acquit merely because the defendant was ignorant of the law. See Crenshaw, 98 Wash.2d at 796, 659 P.2d 488; see also State v. Minor, 162 Wash.2d 796, 802, 174 P.3d 1162 (2008) ("Ignorance of the law is generally not a defense."). For this reason, the Crenshaw court approved the "legal wrong" instruction, concluding, "[T]he trial court could assume that one who knew the illegality of his act was not necessarily `beyond any of the influences of the criminal law.'" Crenshaw, 98 Wash.2d at 797, 659 P.2d 488 (quoting State v. McDonald, 89 Wash.2d 256, 272, 571 P.2d 930 (1977), overruled on other grounds by Sommerville, 111 Wash.2d at 531, 760 P.2d 932).
¶ 62 The Crenshaw court's holdingthat a "legal wrong" instruction was proper in a case where the defendant knew the illegality of his actssupports the trial court's reliance here on Chanthabouly's admissions that he understood the illegality of his act. Furthermore, as we discuss above, Chanthabouly's knowledge about the illegality of his acts was not the sole basis of the trial court's ruling. For these reasons, the trial court did not err by denying Chanthabouly's motion for acquittal.

II. Jury's Rejection of Insanity Defense
¶ 63 Chanthabouly also argues that the jury should have acquitted him by reason of insanity because the "evidence is undisputed" that he "acted in the delusion of self defense." Appellant's Br. at 21. We disagree.
¶ 64 As a preliminary matter, the State suggests that Chanthabouly challenges not only the jury's rejection of his insanity defense on appeal but also the sufficiency of the evidence supporting the murder conviction. In support, the State cites Chanthabouly's assignment of error 4, which asserts, "The jury erred by convicting Douglas Chanthabouly of second degree murder where he should have been acquitted by reason of insanity." Appellant's Br. at 1. It is clear, however, from this assignment of error and from Chanthabouly's brief argument about the jury's verdict on page 21 of his brief, that he challenges only the jury's rejection of the insanity defense, not the sufficiency of the State's evidence.

A. Standard of Review
¶ 65 The parties disagree about the proper standard of review for evaluating a jury's rejection of the insanity defense. Division One of this court has resolved this issue. See State v. Matthews, 132 Wash.App. 936, 941, 135 P.3d 495 (2006). When reviewing a jury's rejection of a defendant's insanity defense, we look to see whether, after "considering the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove *161 the defense by a preponderance of the evidence." [15]Matthews, 132 Wash.App. at 941, 135 P.3d 495 (quoting State v. Lively, 130 Wash.2d 1, 17, 921 P.2d 1035 (1996)); accord Crenshaw, 98 Wash.2d at 802-04, 659 P.2d 488 (affirming jury's rejection of insanity defense by reviewing trial evidence and concluding that appellant failed to meet the preponderance standard).

B. Jury Properly Rejected Insanity Defense
¶ 66 Here, the same reasons that the trial court cited for denying the acquittal motion support the jury's rejection of the insanity defense. A rational trier of fact could have found that Chanthabouly was able to "tell right from wrong" based on his attempts to conceal his involvement, his statements suggesting that he understood that others would view his act as wrong, his demeanor during the police interview, his failure to claim self defense, and his statements suggesting that he knew his acts were against the law. Additionally, the jury heard from witnesses who reported Chanthabouly's statements to Kok before and during the shooting. Viewing the facts in the State's favor, a rational trier of fact could have found that Chanthabouly failed to prove the insanity defense by a preponderance of the evidence.

III. Ineffective Assistance of Counsel
¶ 67 Chanthabouly next argues that his counsel provided ineffective assistance by failing to propose a jury instruction "that a person who takes a life in the delusional belief that he was acting in self defense is, according to M'Naghten, legally incapable of distinguishing right from wrong." Appellant's Br. at 24. He contends that because the defense did not propose such an instruction, "the jury did not know the law and could not understand the defense's argument." Appellant's Br. at 21. This argument fails.

A. Standard of Review
¶ 68 The federal and state constitutions guarantee the effective assistance of counsel. See U.S.Const. amend. VI; Wash. Const. art. I, § 22; Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Grier, 171 Wash.2d 17, 32, 246 P.3d 1260 (2011). To establish ineffective assistance of counsel, Chanthabouly must overcome a strong presumption that counsel was effective by demonstrating that (1) counsel's performance was deficient by an objective standard of reasonableness, and (2) the deficient performance prejudiced him. Strickland, 466 U.S. at 687-89, 104 S.Ct. 2052. To demonstrate that counsel's failure to request an instruction is deficient performance, Chanthabouly must demonstrate that he was entitled to the instruction. See State v. Cienfuegos, 144 Wash.2d 222, 227, 25 P.3d 1011 (2001).

B. No Entitlement to Instruction
¶ 69 As we discussed above, the Crenshaw court approved an insanity defense instruction that defined "right and wrong" *162 solely in terms of a person's knowledge about whether the act was "contrary to the law." 98 Wash.2d at 793-94, 659 P.2d 488. Later in the opinion, the court stated, "[W]e hold prospectively that as a general rule no definition of wrong should accompany an insanity defense instruction." Crenshaw, 98 Wash.2d at 805, 659 P.2d 488. The court explained, "As the [l]egislature has chosen to codify the M'Naghten test in statutory form, it would be preferable to have this test presented to the jury without any elaboration. This would permit both parties to argue their theories of the case." Crenshaw, 98 Wash.2d at 805, 659 P.2d 488; accord State v. Applin, 116 Wash. App. 818, 821, 824, 67 P.3d 1152 (2003) (rejecting appellant's contention that insanity defense instruction must include an instruction that wrongfulness refers to moral, as well as legal, wrong).
¶ 70 Under Crenshaw's prospective holding, therefore, defense counsel did not perform deficiently by failing to propose an instruction further defining the insanity defense's "right from wrong" element. Here, just as Crenshaw counseled, the trial court provided the statutory definition of the insanity defense as embodied by the pattern jury instruction. See 98 Wash.2d at 805, 659 P.2d 488; WPIC 20.01, at 336. The trial court permitted Chanthabouly to introduce evidence and argument that he acted under a delusional belief of self defense when he killed Kok. Thus, he was able to argue his theory of the case to the jury.

IV. Voir Dire
¶ 71 Chanthabouly next argues that the trial court abused its discretion when it denied his motion for a mistrial after the trial court "cut off voir dire unexpectedly." Appellant's Br. at 25. Specifically, he argues that the trial court's curtailment of voir dire limited his ability to inquire into venire members' potential biases with regard to self defense, race, and gangs. With regard to self defense, Chanthabouly argues that his inability to ask the venire about its views of self defense prejudiced him because "[i]f . . . a juror believed it is always immoral to take another life, even where such an act is done in defense of your own life, then this would impact that juror's ability to decide this case without bias." Appellant's Br. at 28. This argument fails.
¶ 72 A trial court should grant a mistrial only when the "defendant has been so prejudiced that nothing short of a new trial can [e]nsure that the defendant will be tried fairly." State v. Roberts, 142 Wash.2d 471, 533, 14 P.3d 713 (2000) (quoting State v. Lewis, 130 Wash.2d 700, 707, 927 P.2d 235 (1996)). We review the trial court's denial of a motion for a mistrial for abuse of discretion. State v. Rodriguez, 146 Wash.2d 260, 269, 45 P.3d 541 (2002). A trial court abuses its discretion when it makes decisions based on untenable grounds or for untenable reasons. State v. Foxhoven, 161 Wash.2d 168, 174, 163 P.3d 786 (2007). We will not disturb a trial court's ruling on the scope and content of voir dire "absent an abuse of discretion and a showing that the rights of an accused have been substantially prejudiced." State v. Davis, 141 Wash.2d 798, 826, 10 P.3d 977 (2000).
¶ 73 The trial court properly exercised its discretion during voir dire. Contrary to Chanthabouly's assertion, it did not "cut off voir dire unexpectedly." Appellant's Br. at 25. Rather, at the end of the second day, the trial court informed the parties that it planned to allow each side at least two rounds of questioning the following day. The trial court followed this plan. Moreover, the trial court allowed the defense two additional rounds of questioning. At no point did the trial court prevent the defense from asking questions about gangs or race.
¶ 74 It is true that, at the end of the third day, the trial court sustained the State's objection to the defense's question, "Does anybody believe that you should be able to defend yourself with a weapon?" RP (Mar. 11, 2009) at 521. The trial court's decision to sustain this single objection did not amount to an abuse of discretion. Defense counsel asked an earlier question about self defense, and two other venire members mentioned it during the open-ended discussion about gun ownership. Additionally, self defense was only relevant to the defense's case to the extent that it could prove that Chanthabouly acted in a delusion of self defense.

*163 V. Vagueness of Aggravating Circumstance
¶ 75 Chanthabouly further argues that the "destructive and foreseeable impact" aggravating circumstance is unconstitutionally vague. See RCW 9.94A.535(3)(r). Accordingly, he contends that the trial court erred by denying his pre-trial motion to dismiss this aggravating factor. Citing State v. Baldwin, 150 Wash.2d 448, 458, 78 P.3d 1005 (2003), the State responds that Chanthabouly cannot challenge this aggravating circumstance on vagueness grounds. We agree with the State.
¶ 76 "[T]he due process vagueness doctrine under the Fourteenth Amendment and article I, section 3 of the state constitution requires that citizens have fair warning of proscribed conduct." State v. Bahl, 164 Wash.2d 739, 752, 193 P.3d 678 (2008). To survive a vagueness challenge, a statute must be clear enough to give fair warning of what conduct is proscribed, and it must have ascertainable standards of guilt to prevent arbitrary enforcement. Baldwin, 150 Wash.2d at 458, 78 P.3d 1005.
¶ 77 In Baldwin, our Supreme Court held that the "sentencing guideline statutes" at issue there were "not subject to a vagueness analysis" because they did not create a constitutionally protectable liberty interest. 150 Wash.2d at 459, 461, 78 P.3d 1005. There, the sentencing statutes at issue were former RCW 9.94A.120(2) (2000), which provided for the imposition of a standard range sentence unless the trial court found substantial and compelling reasons to impose an exceptional sentence, and former RCW 9.94A.390(2)(d) (2000), which characterized a crime that was a "major economic offense" as an aggravating circumstance that could justify an exceptional sentence under former RCW 9.94A.120(2) (2000). Baldwin, 150 Wash.2d at 458-59, 78 P.3d 1005.
¶ 78 The Baldwin court stated that "the due process considerations that underlie the void-for-vagueness doctrine" did not apply to these sentencing guideline statutes because these statutes did not (1) define conduct, (2) allow for arbitrary arrest and criminal prosecution, (3) inform the public of penalties attached to criminal conduct, or (4) vary the legislatively imposed maximum and minimum penalties for any crime. 150 Wash.2d at 459, 78 P.3d 1005. Because nothing in these guideline statutes "require[d] a certain outcome," they did not create a constitutionally protectable liberty interest. Baldwin, 150 Wash.2d at 461, 78 P.3d 1005.
¶ 79 Baldwin precludes Chanthabouly from challenging the "destructive and foreseeable impact" aggravating circumstance on vagueness grounds. This aggravating circumstance does not define conduct, authorize arrest, inform the public of criminal penalties, or vary legislatively defined criminal penalties. See Baldwin, 150 Wash.2d at 459, 78 P.3d 1005.
¶ 80 Chanthabouly argues, without authority or significant discussion, that Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), might affect Baldwin's holding. Even assuming, without deciding, that these cases apply, there would be no constitutional violation here because the jury found the aggravating circumstance beyond a reasonable doubt.

VI. Sufficiency of Aggravating Circumstance
¶ 81 Chanthabouly next argues that the State presented insufficient evidence to support the "destructive and foreseeable impact" aggravating factor. Specifically, he contends that "[t]he State did not prove in this case that the impact was more severe than the average murder that takes place in public." Appellant's Br. at 35. This argument fails.

A. Standard of Review
¶ 82 We review a jury's special verdict finding the existence of an aggravating circumstance under the sufficiency of the evidence standard. State v. Stubbs, 170 Wash.2d 117, 123, 240 P.3d 143 (2010); see also RCW 9.94A.585(4) (stating that this court may reverse a sentence outside of the standard range if "the reasons supplied by the sentencing court are not supported by the record."). Under this standard, we review the evidence in the light most favorable to the State to determine whether any rational *164 trier of fact could have found the presence of the aggravating circumstances beyond a reasonable doubt. See State v. Yates, 161 Wash.2d 714, 752, 168 P.3d 359 (2007).

B. Sufficient Evidence Exists of "Destructive and Foreseeable Impact"
¶ 83 A trial court may impose an exceptional sentence if the offense involves a "destructive and foreseeable impact on persons other than the victim." RCW 9.94A.535(3)(r). This is an aggravating circumstance that the State must prove to the jury beyond a reasonable doubt. Former RCW 9.94A.535(3) (Laws of 2005, ch. 68, § 3); former RCW 9.94A.537(2) (Laws of 2005, ch. 68, § 4). When a jury finds this aggravating circumstance, the court may sentence the offender to a term of confinement up to the statutory maximum for the underlying conviction "if it finds . . . that there are substantial and compelling reasons justifying an exceptional sentence." Former RCW 9.94A.535 (Laws of 2005, ch. 68, § 3); former RCW 94A.537(5) (Laws of 2005 ch. 68, § 4).
¶ 84 The legislature enacted RCW 9.94A.535(3)(r) in 2005. Laws of 2005, ch. 68, § 3. Before 2005, sentencing courts sometimes imposed exceptional sentences based on a crime's impact on non-victims. See, e.g., State v. Johnson, 124 Wash.2d 57, 63-64, 873 P.2d 514 (1994); State v. Mulligan, 87 Wash. App. 261, 263, 941 P.2d 694 (1997); State v. Way, 88 Wash.App. 830, 832, 946 P.2d 1209 (1997). In these cases, courts required "that defendant's actions impact others in a distinctive manner not usually associated with the commission of the offense in question, and that this impact be foreseeable to the defendant." Way, 88 Wash.App. at 834, 946 P.2d 1209 (citing Johnson, 124 Wash.2d at 74-75, 873 P.2d 514).
¶ 85 Here, any rational trier of fact could have found that the shooting involved a "destructive impact" on the students, teachers, and administrators at Foss. The shooting occurred in a public school hallway populated with students and staff. At least two students witnessed the killing from a distance of less than 10 feet. One of these students received medical treatment for irritation to her eyes. Another student who witnessed the shooting spoke with a counselor afterward. That student testified that the shooting "affected me tremendously. It made me realize that I could die any time and that bad things happen." RP (Mar. 12, 2009) at 684. A teacher who heard the shots suffered insomnia after the incident and felt more distant from friends and family who had not experienced the trauma of the shooting. The principal testified that the shooting "continues to affect me profoundly," and he recalled that no "training or experience can ever prepare you to . . . tell a family that their son had been killed while they're [sic] under your supervision." RP (Mar. 16, 2009) at 847.
¶ 86 Additionally, this destructive impact was both unique and foreseeable. Chanthabouly killed a fellow student at his school in front of his schoolmates. Several teachers and administrators heard the shooting and tried to save the victim. This is an even more traumatizing experience for non-victims than in Johnson, a case in which our Supreme Court affirmed the exceptional sentence of a defendant who "discharge[d] a deadly weapon at persons fleeing in automobiles in the immediate vicinity of a public elementary school while classes [were] in session." 124 Wash.2d at 75, 79, 873 P.2d 514. As the Johnson court observed, the individual who discharges the weapon in such circumstances "should reasonably foresee that other persons, that is, children and their parents, who are not necessarily the intended victims, would be traumatized by those actions."[16] 124 Wash.2d at 75, 873 P.2d 514.

*165 VII. Cumulative Error
¶ 87 We may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant his or her right to a fair trial, even if each error standing alone would be harmless. State v. Weber, 159 Wash.2d 252, 279, 149 P.3d 646 (2006); State v. Hodges, 118 Wash. App. 668, 673-74, 77 P.3d 375 (2003). Because the trial court did not err, this doctrine does not apply here.
¶ 88 We affirm.
We concur: HUNT and WORSWICK, JJ.
NOTES
[1] RCW 9A.32.030(1)(a).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Because Chanthabouly made this statement before the police advised him of his Miranda rights, the trial court excluded this statement at trial.
[4] Chanthabouly was born in August 1988.
[5] It is unclear from the record whether Chanthabouly's brother spells his name "Dao" or "Dau."
[6] According to Dr. Gallagher, "thought blocking" occurs when a person's thinking is slowed due to "acute symptoms of psychosis." RP (Feb. 18, 2009) at 66-67. "Sometimes they're distracted by the voices they're hearing in their head. Sometimes they're just processing very, very slowly." RP (Feb. 18, 2009) at 67.
[7] Earlier this year, the legislature amended RCW 9A.12.010(1) to make it gender neutral. Laws of 2011, ch. 336, § 353. We cite to the version of RCW 9A.12.010(1) in effect on the date of Chanthabouly's crime.
[8] The experts' reports recount Chanthabouly's pre-offense psychiatric history, beginning with his admission to a psychiatric hospital at age 16 after attempting suicide by drinking ammonia and bleach. The admitting physician observed that Chanthabouly had "delusions of persecution" and described him as "visibly responding to auditory hallucinations." Ex. 2 at 5. Eventually, he was diagnosed with paranoid schizophrenia, prescribed antipsychotic medication, and referred to outpatient care.
[9] Specifically, Dr. Gallagher and Dr. Leung each concluded that Chanthabouly's statements to them and to others demonstrated that he knew that he was shooting a human being at the time of the act and that the victim could be harmed by this act.
[10] 98 Wash.2d 789, 659 P.2d 488 (1983).
[11] The standard community custody range for second degree murder is 24 to 48 months.
[12] M'Naghten's Case, (1843) 8 Eng. Rep. 718 (H.L.) 722; 10 Clark & Fin. 200, 210.
[13] Although RCW 10.77.080 requires the trial court to "enter specific findings" if it acquits the defendant by reason of insanity, it does not require findings if the trial court denies the acquittal motion.
[14] The State argues that, under Sommerville, we should consider "only whether substantial evidence supports the trial court's determination." Resp't's Br. at 15. We disagree. The Sommerville court first determined that substantial evidence supported the facts underpinning the trial court's ruling and then applied these facts to the legal standard for insanity. See Sommerville, 111 Wash.2d at 534, 760 P.2d 932. We do the same.
[15] The State asks us to disregard Matthews and to review the jury's rejection of the insanity defense under the general sufficiency standard of review. But we think that the Matthews court correctly applies our Supreme Court's reasoning in State v. Lively, 130 Wash.2d 1, 17, 921 P.2d 1035 (1996), to support its reasoning. Although Lively involved the affirmative defense of entrapment, not insanity, the Lively court's language and citations strongly suggest that the standard of review for a jury's rejection of an entrapment defense also applies to a jury's rejection defense of other affirmative defenses, like insanity, where the defendant bears the burden of persuasion to prove the affirmative defense:

Other jurisdictions have examined the standard of review for sufficiency of the evidence when a defendant is required to prove an affirmative defense by a preponderance of the evidence. The appropriate standard of review in such cases is whether, considering the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove the defense by a preponderance of the evidence. Wilson v. State, 257 Ga. 444, 359 S.E.2d 891 (1987) (challenge of a conviction based on the affirmative defense of insanity); State v. Roy, 395 So.2d 664 (La. 1981) (insanity defense); State v. Bell, 647 So.2d 498, 500 (La.App.1994) (the defense of reasonable discipline of a child). We are persuaded that this test provides the appropriate means of reviewing the sufficiency of evidence relating to an affirmative defense.
Lively, 130 Wash.2d at 17, 921 P.2d 1035; see also former RCW 9A.12.010(2); RCW 10.77.030(2) (defendant must establish insanity by a preponderance of the evidence).
[16] For support, Chanthabouly cites Way, a case in which the defendant shot and killed his estranged wife on a community college campus. 88 Wash.App. at 832, 946 P.2d 1209. Although the court agreed that the adult students experienced psychological trauma, the court distinguished Johnson and reversed the exceptional sentence. Way, 88 Wash.App. at 834-36, 946 P.2d 1209. As the court explained,

[T]he circumstances of this crime do not set it apart from many other murders committed in the presence of others. Violent crimes undoubtedly may cause psychological trauma to those unfortunate enough to witness the events. But that would be true if the crime were committed on a public street, in a theater or shopping mall, or in many places of employment. The fact that this crime was committed in a public place in the presence of adult onlookers is not a basis for imposing an exceptional sentence.
88 Wash.App. at 834, 946 P.2d 1209. This case can be distinguished from Way because Chanthabouly killed the victim in front of other children, not adult onlookers.