FILED
COURT OF APPEALS
DIVISION II

2015 JAN 16 AM 9: 35

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44709-6-II |
| Respondent, | |
| v. | |
| REBECCA JEAN BALE, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. – Rebecca Jean Bale appeals her stipulated facts bench trial conviction for attempted child molestation in the first degree. She argues the trial court erred in denying her motion to acquit by reason of insanity. Even though Bale was able to perceive the nature of her actions and able to tell right from wrong, she contends she was insane because she did not understand the "quality"[1] of her actions. Substantial evidence supports the trial court's finding that Bale had the ability to perceive the "quality" of her actions; therefore, we affirm.

## FACTS

### I. BACKGROUND

Bale has a history of mental health issues and a diagnosis of schizoaffective disorder, bipolar type. On February 14, 2012, Bale invited her eight-year-old neighbor to her apartment for

---

[1] Br. of Appellant at 6.

some candy, shut and locked the door, forced the child into a chair, removed her own pants, and then pulled down the child's pants. The child pulled her pants back up and fled Bale's apartment. Bale followed the girl to her apartment and remained outside for a short time before returning to her own apartment. Meanwhile, the girl's mother called the police.

When the police officers contacted Bale at her apartment, Bale gave them a false name. Bale told the officers that she did not know any little girl and later denied having had the girl in her apartment. Bale suddenly remembered the girl, however, when one of the officers told her that she had seen Bale knocking on the girl's door a few minutes earlier. Bale continued to deny that the girl had been in her apartment. At one point, Bale admitted she had given the girl some cereal and they had been sitting on the couch watching the movie *Pirates of the Caribbean*. When the officer specifically asked Bale why she had pushed the girl back on the couch and attempted to pull her pants down, Bale said she did it but did not touch the child. When Bale realized what she had just said, she reiterated that she did not "do anything." Clerk's Papers (CP) at 19.

## II. PROCEDURE

The State charged Bale with attempted first degree child molestation. The trial court granted Bale's request for a competency evaluation and an evaluation of her "sanity at the time of the alleged offense." CP at 43. The trial court found Bale competent to stand trial.[2] On the separate issue of insanity, Bale obtained an independent evaluation from forensic psychologist Dr. Mark Bennett Whitehill. Based on this evaluation, Bale moved for acquittal on grounds of insanity at the time of the offense. She argued that she had established, by a preponderance of the evidence,

---

[2] Bale does not challenge the trial court's competency finding.

2

that at the time of the offense, she was so affected by a mental disease or defect that she was unable (1) to perceive the nature and quality of the charged act, or (2) to tell right from wrong with reference to the charged act. RCW 9A.12.010. The trial court held an evidentiary hearing on the motion to acquit.

A. Testimony and Examination Reports

1. Dr. Whitehill

Dr. Whitehill testified for Bale at the hearing on the motion to acquit; his testimony was consistent with his report. He testified that Bale suffered from schizoaffective disorder, bipolar type; that she was not taking her medication at the time of the incident; and that she was experiencing "an acute psychotic state" at the time of the incident. Verbatim Report of Proceedings (VRP) (Nov. 28, 2012) at 11.

Dr. Whitehill testified that when he interviewed Bale, she told him that on the day of the incident, she had been receiving "messages" from her television while watching the movie *Pirates of the Caribbean.* VRP (Nov. 28, 2012) at 11. These "messages" told her "that she had to rape, pillage, and plunder." VRP (Nov. 28, 2012) at 11. At the same time, she also believed that the "'thought police,'" an apparent reference to George Orwell's novel, *1984*,[3] "were able to read her thoughts and read her mind" and that they were also communicating with her. VRP (Nov. 28, 2012) at 11.

---

[3] G. ORWELL, 1984 (1932).

Bale also told Dr. Whitehill that she had concluded she would not be able to "pillage and plunder"[4] because "it might be dangerous for her"[5] and the victim or victims "might harm her in some way."[6] She decided she might be able to "rape," so she lured the neighbor child into her apartment by offering the girl some candy. VRP (Nov. 28, 2012) at 12. In his report, Dr. Whitehall stated that Bale told him that "she did not want to [rape] the girl and that she recognized that it was something wrong." CP at 87. She said she was afraid that she or her family would be tortured and killed if she did not comply with the voices she heard from the movie she had been watching.

In both his report and testimony, Dr. Whitehill concluded that at the time of the offense Bale was "legally insane," because her delusional state rendered her unable to perceive the nature and quality of her behavior. VRP (Nov. 28, 2012) at 27. He conceded, however, that Bale knew the "physical"[7] nature of actions (that she was interacting with a child, rather than "an object,"[8] and that she was attempting to "rape"[9] the child). Dr. Whitehill opined that Bale would not have been able to "recognize either the legal consequences of her behavior, or the level of harmfulness of her behavior, . . . the quality of her behavior, what exactly she was doing, and its impact was compromised to the point where she was unable to perceive [the] nature and quality" of the act.

---

[4] VRP (Nov. 28, 2012) at 11.

[5] VRP (Nov. 28, 2012) at 44.

[6] VRP (Nov. 28, 2012) at 44.

[7] VRP (Nov. 28, 2012) at 37.

[8] VRP (Nov. 28, 2012) at 30.

[9] VRP (Nov. 28, 2012) at 29.

VRP (Nov. 28, 2012) at 28. He further opined that he did not believe that Bale "was able to formulate any appreciation of the degree of harmfulness" because "her behavior was guided at the time . . . by prominent delusions about her need to commit this act." VRP (Nov. 28, 2012) at 31.

On cross-examination, Dr. Whitehill testified that Bale could distinguish right from wrong at the time of the incident and that she knew what she was doing was wrong. He agreed that Bale had "lied" to the police when they contacted her.[10] VRP (Nov. 28, 2012) at 37. Dr. Whitehill also reiterated that he believed that the definition of "nature and quality" included an appreciation of the act's "moral significance," the "appreciation of harm," and/or the "appreciation of legal consequences." VRP (Nov. 28, 2012) at 39. He believed that "[t]o appreciate the quality," a person had to have "some recognition of what the behavior is about, how it's regarded, and what could happen." VRP (Nov. 28, 2012) at 39. And he reasserted his belief that Bale's delusional condition prevented her from having such recognition.

### 2. Dr. Hendrickson

Forensic psychologist Dr. Ray Hendrickson, evaluated Bale at Western State Hospital, submitted an evaluation report, and testified for the State. Dr. Hendrickson agreed that Bale suffered from schizoaffective disorder, bipolar type, and that she was delusional at the time of the incident; and he generally agreed with Dr. Whitehill's characterization of what happened during the incident. Dr. Hendrickson testified, however, that when he interviewed Bale, her description of her "beliefs" during that time focused more on the "'thought police'" than on the movie she was

---

[10] Dr. Whitehill's report suggested that Bale lied to the police because she believed they were the "thought police." CP at 88.

5

watching. VRP (Nov. 28, 2012) at 54. Bale told Dr. Hendrickson that she had to do what the "'thought police'" wanted her to do or she or her family would be harmed. VRP (Nov. 28, 2012) at 54.

Dr. Hendrickson opined that Bale "had the capacity to know what she was doing at the time" and that "she certainly was able to perceive the nature of the act, meaning she knew what she was doing." VRP (Nov. 28, 2012) at 56, 57. But Dr. Hendrickson was unwilling to give an opinion as to whether Bale understood the "quality" of her act because he believed that this was "more of a legal question than a psychological question, which [was] obviously . . . beyond the scope of [his] examination and opinion[s] that [he was] offering." VRP (Nov. 28, 2012) at 58.

Dr. Hendrickson testified that this case was difficult because of Bale's delusional belief system, which "incorporate[d] a whole legal system." VRP (Nov. 28, 2012) at 59. He opined that "within the adopted legal system she was adhering to, [her actions] made perfectly good sense to her, even though if you contrast that to the legal system in which we operate and we know about, there certainly is a contrast." VRP (Nov. 28, 2012) at 59. Dr. Hendrickson noted,

> She described the behavior that she engaged in as being necessary in this belief system to reach this higher goal, and that if she did not [act], that the "thought police" would harm her or her family, so that was part of this fixed delusional belief that she had, at least that she expressed to me.

VRP (Nov. 28, 2012) at 60.

In his report, Dr. Hendrickson stated that Bale told him that the messages she was receiving told her "'[t]o murder'" and that she had attempted to resist these messages on the day of the incident, but she was "'afraid [the thought police] would torture [her], kill [her] if [she] didn't do it.'" CP at 102. He also stated:

[Bale] stated the messages told her to do things, "They said to rape, pillage, and plunder . . . I thought I was supposed to do that . . . but I was afraid to go outside . . . it was dark. I thought of going to a neighbor, but they were adults . . . I thought I might get hurt. I thought of the little girl downstairs, I told her I had some candy for her . . . she was eight years old. She had been my neighbor for a while. I thought she needed candy. I gave her a variety of candy. I stopped giving her candy . . . my brother said it was dangerous giving candy to kids . . . because if something happened I could get in trouble."

She continued, "I made an offer [of candy] but I was lying . . . just trying to do something bad . . . but it didn't seem bad because it was what I was supposed to do . . . the thought police were telling me to do those things.

CP at 102-03 (some alterations in original).

Bale admitted to Dr. Hendrickson that she had lied to the police, but she asserted that she was "'confused about what [she] was supposed to say [; she] had to lie to the thought police . . . tell the truth to the real police.'" CP at 103. When he asked Bale about why she had to "do the opposite with the 'thought police,'" Bale told him, "'Because the government controls you . . . you're supposed to move and corrupt things . . . to go up the ladder.'" CP at 103. She continued, stating that when a person "reached the top of the ladder [by doing bad things], 'You are in charge.'" CP at 103 (alterations in original). She also stated that even if she had realized the police were the "'real police,'" she would have lied to them because she was "'too scared.'" CP at 103. In addition, Bale told Dr. Hendrickson, "'If I do good things and don't watch TV or do anything, they would come and torture you . . . they would take your family away . . . torture them. I recognize the things are bad, but to the rest of the world they were not bad. This was my delusional belief.'" CP at 103.

In evaluating whether Bale was aware of the legal consequences of her actions, Dr. Hendrickson concluded that Bale was "apparently conflicted about what her actions might mean,"

she wanted to avoid being tortured and killed by the thought police and to keep her family safe from them, she was also aware of "the victim's circumstances." CP at 63. Despite this awareness, Bale was "apparently focused on her own survival, in accordance with her stated delusional belief, and not necessarily on the plight of the victim." CP at 63.

Dr. Hendrickson's report also stated that when evaluating the ability to know right from wrong with respect to acts charged, the focus was a legal, as opposed to a moral one, and that Bale's actions were based on her delusional belief "regarding a society that required one to act contrary to the normal moral/legal dictates." CP at 63. Despite her delusions, his report stated that at some level Bale understood the societal/legal norms for our society. Dr. Hendrickson concluded that Bale's "impulse control, her ability to accurately perceive reality, and her ability to rationally foresee the consequences of her actions was significantly limited and impaired." CP at 64.

B. Trial Court's Rulings and Subsequent Proceedings

The trial court orally ruled that (1) Bale suffered from a mental disease; (2) she committed the act of attempted sexual molestation on February 14, 2012; and (3) at that time she was able to tell right from wrong and knew her actions were wrong. The remaining question was whether Bale was "unable to perceive the nature and quality of the act with which she [was] charged." VRP (Nov. 30, 2012) at 80.

Addressing this element, the trial court first concluded that, under *State v. Jamison*, 94 Wn.2d 663, 665, 619 P.2d 352 (1980), Bale had to show that she was *incapable* of perceiving the nature and quality of her actions, not just that her perception was compromised or limited. The trial court found that Bale's behavior was inconsistent with her contention that she was just

attempting to protect herself or her family. The trial court found that although Bale had a significant impairment, she failed to prove that she was "unable to perceive the nature and quality of the act" with which she [was] charged. VRP (Nov. 30, 2012) at 83. The trial court also found that Bale's actions of luring the child, removing the child to a private location, and lying to the police demonstrated she knew what she was doing was wrong under the law or general social mores.[11]

Bale waived her right to a jury trial and agreed to a bench trial. Bale stipulated to the facts in the police report and child interview report, which are set out above, and agreed that those facts established her guilt, but she preserved the issue of her insanity defense. The trial court found Bale guilty of attempted first degree child molestation. Bale appeals.

## ANALYSIS

Bale argues that the trial court erred when it denied her motion to acquit on grounds of insanity. She contends that the evidence does not support the trial court's finding that she was able to perceive the "quality" of her actions. Br. of Appellant at 7. Her argument fails.

---

[11] The parties later consented to having another judge sign written findings of fact and conclusions of law on the motion to acquit because the original judge was no longer available. Because a successor judge lacks the authority to enter findings of fact based on testimony heard by a predecessor judge, we do not consider these written findings of fact and conclusions of law. RCW 2.28.030(2); *In re Marriage of Crosetto*, 101 Wn. App. 89, 95-96, 1 P.3d 1180 (2000). Instead, because no written findings of fact and conclusions of law are required when a trial court denies a motion for acquittal on grounds of insanity, on review, we consider only the original court's oral ruling. RCW 10.77.080; *State v. McDonald*, 89 Wn.2d 256, 267-68, 571 P.2d 930 (1977), *overruled in part on other grounds by State v. Sommerville*, 111 Wn.2d 524, 760 P.2d 932 (1988).

## I. STANDARD OF REVIEW

We review a trial court's findings of fact on a motion to acquit on grounds of insanity for substantial evidence. We then determine whether these findings support the trial court's legal conclusion that the defendant has failed to prove insanity by a preponderance of the evidence. *State v. Chanthabouly*, 164 Wn. App. 104, 128-29, 262 P.3d 144 (2011) (citing *State v. Sommerville*, 111 Wn.2d 524, 533-34, 760 P.2d 932 (1988)), *review denied*, 173 Wn.2d 1018 (2012). We consider any unchallenged findings of fact to be verities on appeal. *Chanthabouly*, 164 Wn. App. at 129 (citing *State v. Shaver*, 116 Wn. App. 375, 380, 65 P.3d 688 (2003)).

Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. *State v. Thetford*, 109 Wn.2d 392, 396, 745 P.2d 496 (1987). The fact finder must weigh the evidence and determine the credibility of witnesses. *State v. Jeannotte*, 133 Wn.2d 847, 853, 947 P.2d 1192 (1997). We leave the weight given an expert's conclusions to the fact finder. *State v. Lord*, 117 Wn.2d 829, 854, 822 P.2d 177 (1991), *cert. denied*, 506 U.S. 856 (1992).

## II. MOTION TO ACQUIT ON GROUNDS OF INSANITY

A defendant in a criminal trial may move the trial court for a judgment of acquittal on the grounds of insanity under RCW 10.77.080. At this hearing, defendant has the burden of proving by a preponderance of the evidence that he or she was insane at the time of the offense or offenses with which he or she is charged. RCW 10.77.080.

To establish the defense of insanity, it must be shown that:

(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:

(a) He or she was unable to perceive the nature *and quality* of the act with which he or she is charged; or

(b) He or she was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010(1) (emphasis added). The term "unable" means incapable, not merely possessed of limited capacity—significant impairment is not sufficient. *Jamison*, 94 Wn.2d at 665.

Bale argues the evidence does not support the trial court's finding that she was able to "appreciate the quality of her actions."[12] Br. of Appellant at 7. She contends that the "quality" of an act refers to "the characteristics or features . . . of the act." Br. of Appellant at 8 (citing *Merriam-Webster.com* (accessed 10/30/13)). She does not contend the evidence fails to establish that she

---

[12] Bale also appears to argue that because Dr. Whitehill concluded that Bale did not appreciate the "quality" of her actions and Dr. Hendrickson refused to give an opinion as to that issue, she proved insanity by a preponderance of the evidence. Br. of Appellant at 9. This argument lacks merit because the trial court, as the fact finder, was not bound by Dr. Whitehill's or Dr. Hendrickson's expert opinions and was free to evaluate the evidence as a whole and come to its own conclusion on this issue. *See Lord*, 117 Wn.2d at 854.

In addition, Bale appears to argue that written finding of fact 2 must be vacated because nothing in the record suggests that she attempted to touch the child for sexual gratification. RCW 9A.44.010(2) ("'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party."); RCW 9A.44.083 (first degree child molestation requires sexual contact). The State does not discuss this argument. But on appeal Bale is challenging only the trial court's denial of her motion to acquit by reason of insanity. *See* Br. of Appellant at 10 (citing Clerk's Papers at 9 (Findings of Fact and Conclusions of Law on Motion to Acquit)). And for purposes of that motion she had to "admit[ ] to having committed the act in question." 12 WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 1010, at 198-99 (3d Ed.). Bale does *not* challenge the findings of fact or conclusions of law related to her conviction. Thus, the only question before us at this time is whether the trial court erred in denying Bale's motion to acquit on grounds of insanity. Accordingly, even if we were to consider the written findings of fact, we do not address this issue further.

11

was able to perceive the "nature"[13] of her actions or that she was able to tell right from wrong with reference to this particular act.[14]

Even presuming, but not deciding, that the inability to perceive the "quality" of an act alone can establish insanity, there was sufficient evidence to establish that Bale understood the "quality" of her actions under the definition of "quality" she provides. Bale invited the child up to her apartment for the purpose of "rap[ing]" her. VRP (Nov. 28, 2012) at 12. She took steps towards achieving that goal by pulling the child's pants down. Bale took steps to avoid being detected by luring the child to her apartment away from others, by locking the door, and by later lying to the police. She intentionally chose a vulnerable child victim rather than attempt to "rape, pillage, and plunder" an adult specifically to avoid the risk that a victim would harm her. CP at 102. She had previously ceased giving the child candy after her brother warned her that it was behavior that she could "get in trouble" for if something happened to the child. CP at 103. She admitted to Dr. Hendrickson that she knew what the voices were directing her to do was "bad"[15] and that she believed the voices were requiring her to do things that were the opposite of what society demands.[16] Substantial evidence supports the trial court's oral finding that Bale knew her acts

---

[13] Br. of Appellant at 6.

[14] Bale asserts there are three ways to establish insanity—by establishing (1) she was unable to perceive the nature of her act, (2) she was unable to perceive the quality of her act, or (3) she was unable to tell right from wrong with reference to the act—she provides no citation for this assertion.

[15] CP at 103.

[16] Dr. Hendrickson stated in his report, "At some level, [Bale] appeared to have an understanding of the societal/legal norms for behavior in our society," and he expressed that Bale felt compelled to behave inconsistently with what she knew were the societal/legal expectations in order to accommodate her overlying "delusional belief system." CP at 63.

12

No. 44709-6-II

were either legally or morally wrong and that they had consequences for both her and the victim, and, therefore, Bale had the ability to perceive the "quality" of her actions.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Sutton, J.

J. Sutton

We concur:

Worswick, C.J.

Lee, J.

13